Thomas H. WINSETT, Plaintiff,

v.

F. Earl McGINNES, Secretary of the Department of Health and Social Services, Paul W. Keve, Director of the Delaware Division of Adult Corrections, Raymond W. Anderson, Superintendent of Delaware Correctional Center, Donald R. Davis, Deputy Superintendent of the Delaware Correctional Center, Defendants.

Civ. A. No. 74–210.

United States District Court,
D. Delaware.

Jan. 31, 1978.

Arlen B. Mekler, Wilmington, Del., for plaintiff.

John A. Parkins, Jr., Asst. Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

OPINION

STAPLETON, District Judge:

This 42 U.S.C. § 1983 action is brought by Thomas Winsett, an inmate at the Delaware Correctional Center ("D.C.C."). Plaintiff complains that the defendant prison officials [1] have denied him classification to the work release program at D.C.C. in violation of his rights to due process of law and equal protection under the Fourteenth Amendment. Plaintiff seeks compensatory and punitive damages, as well as a declaratory judgment and an injunction prohibiting further infringement.[2] This Opinion sets forth the Court's findings of fact and conclusions of law following a trial on the merits.

Winsett was sentenced in 1964 to a term of natural life after having been found guilty of the murder of State Police Officer Robert Paris. The killing caused a substantial public reaction in the State of Dela-

---

1. Defendants' motion for a directed verdict as to Donald R. Davis and F. Earl McGinnes was granted at the close of plaintiff's presentation of his case. Transcript C–49–67.

2. This Court previously dismissed plaintiff's claim of entitlement to an injunction directing that he be classified to work release on the authority of *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). *Winsett v. McGinnes*, 425 F.Supp. 609 (D.Del.1976).

ware, and is still the subject of deep resentment on the part of some citizens.

Winsett has applied for work release classification three times and on each occasion has been turned down. He claims that he met all established criteria for work release status and that each denial was motivated wholly, or at least in substantial part, by prison officials' fear of possible retaliation by the Delaware General Assembly (most likely in the form of budget, personnel or program cutbacks) and of adverse public reaction. Plaintiff maintains that such fears are impermissible reasons for denial of work release status.

Winsett's first turndown for work release classification was received by him on September 26, 1974. Winsett had applied for work release status, had been approved at the first level by the Minimum Security Building Classification Team, and had been approved at the second level by the Institution Classification Committee. At the third and final level of screening, however,—that of the Superintendent (at this time defendant Raymond W. Anderson)—Winsett was informed that his application could not be approved "due to the sensitivity of [his] offense". (PX 1). The criteria and procedure for work release that were in effect at this time (DX 9) required final approval by the Superintendent. (Paragraph II 1.c of DX 9).

During August, 1974, Winsett's case had been brought to the public's attention via copies of a letter to Superintendent Anderson delivered to the Delaware State News, News-Journal Papers and WAMS radio station, among others, in which a State senator announced his shock and dismay that Winsett might be considered for work release. Anderson responded by letter, sending copies to the same news media and others. In his letter Anderson denied any intention of placing Winsett on work release and stated his position as being "as long as I am Superintendent of the Institution, I shall never be able to entertain any requests from Tom [Winsett] in regards to work release. . . . " (PX 7 letter of August 8, 1974).

Winsett initiated the instant suit in October, 1974.

The second turndown for work release classification came on May 14, 1976, and the circumstances surrounding it are somewhat more complicated. At that time defendant Paul Keve was Acting Commissioner of the Delaware Department of Corrections and defendant Milton Horton was Assistant Director of the Adult Division. The criteria for work release status had changed by March of 1976, prompting Winsett to make a second application for work release classification. (Transcript A–31). The departmental policy then was that any classification for outside status (including work release classification) had to be approved by Acting Commissioner Keve, if the inmate in question had committed a crime of violence. (Transcript E–9). Horton, pursuant to Keve's request, would make specific recommendations for approval or denial of outside status.

Winsett's application was approved at the first level by the Minimum Security Building Classification Team. The application was forwarded to the Institution Classification Committee. A rule had been adopted requiring a letter of employment to be filed with the application before it could be considered. Winsett had not met this requirement initially, but did obtain a letter of offer of employment (PX 11) and refiled his application. Once again the Minimum Security Building Classification Team approved his application, as did the Institution Classification Committee. Horton recommended, however, that Winsett's "application be deferred until [a] decision on [the] transfer." (DX 8). Keve agreed and the application was deferred, but formally recorded as a denial.

The transfer referred to by Horton in his recommendation to Keve was a project that had been developing for some months. Essentially, Keve had hoped to work out a contract with the Corrections Department of the State of Minnesota wherein the interstate transfer of certain inmates could be accomplished. It was felt that this project would have been especially suitable for Winsett. As Keve testified:

. . . [P]robably the best thing to do in the case of Mr. Winsett was to effect a transfer of him to some other state where the extreme sensitivity to this case would be substantially diluted. I felt that whatever time he might be considered truly appropriate for parole, work release, whatever it might be, that it would be much more feasible for it to be accomplished if he were in another state at some distance from Delaware where there was extreme public and legislative sensitivity to anything at all that happened in his case.

Testimony of Keve, Transcript E–12.

. . . I had what I thought was good reason to believe that in addition to the natural hazard that any inmate faces in going into a work release situation, Mr. Winsett faced far more hazards because of the intense sensitivity to the case—intense public reaction and legislative reaction to anything done for or to Mr. Winsett that would smack of any kind of extra privileges.

Testimony of Keve, Transcript E–15.

Based on the record before me, I conclude that the first and second denials of Winsett's application for classification to work release were motivated at least in substantial part by prison officials' concern about a possible retaliation by the Delaware General Assembly. In the case of the second denial, I am convinced Acting Commissioner Keve believed that he had an alternative approach to work release which would better serve Winsett's interests.

The third and final denial for work release classification was received by Winsett on January 7, 1977. In late 1976, the General Assembly created another team that would approve work release classification applicants—the Institutional Release Classification Board. Winsett resubmitted his application for work release status. Again he was approved by the Minimum Security Building Classification Team, and the Institution Classification Committee, as well as the newly created Institutional Release Classification Board. His application was vetoed, however, by Milton Horton, Assistant Bureau Chief of Adult Correction. Horton advanced three reasons for his veto decision: (1) the seriousness of the offense, (2) the lack of a certified parole release date, which he believed was required by the existing guidelines,[3] and (3) the fact that Winsett had had a previous history of model conduct during incarceration in other institutions for other offenses occurring prior to the Paris murder and that, therefore, his good conduct during his present incarceration should be given less weight. This veto was approved by Commissioner Vaughn.

It is unnecessary to pass upon Horton's construction of the guidelines then in effect. I credit his testimony regarding the reasons for his actions and conclude that the third denial of Winsett's application for work release was not motivated by his concern with possible retaliation by the General Assembly or by a concern for public reaction.

Plaintiff makes two arguments: (1) that defendants' denial of his application for work release status deprived him of a liberty interest without due process of law, and (2) that such denials violated his equal protection rights. I deal first with the due process argument.

---

**3.** Horton interpreted the guidelines (see PX 8, attachment at p. 1, paragraph II A) to require Winsett (who was sentenced to natural life and had no good time release date) to be certified for parole before he could be considered eligible for work release. He and several other witnesses testified that experience with work release programs has shown that inmates who have no near prospect of release are not good candidates for a situation involving continuous day-to-day contacts with free citizens. Whatever may be the merits of this view or Horton's construction of the work release guidelines of the Department of Corrections, they do not integrate well with the views of some members of the Board of Parole who have stated that they would like to see how Winsett would fare on work release before making an affirmative decision on parole. (PX 3, 4, 5). While this difference in approach between members of these two State agencies have understandably been frustrating to Winsett, I do not believe it gives rise to a federal question. Winsett has now been on furlough for some time and his experience on furlough will doubtless be made available to the Parole Board when it again reviews his case.

■ In order to invoke a due process claim, a party must first establish that he has been deprived of a liberty interest. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Plaintiff argues that "by instituting a work release program and by promulgating standards for its administration, the Department [of Corrections] has become bound by its decision and has created a vested state law right in the participation by eligible inmates in the work release program". Pl. Reply Br. p. 2.

■ I find this argument unpersuasive. Prior to August 5, 1976 the relevant Delaware statute regarding work release was 11 Del.C. § 6533(a) which provided:

(a) The Department may adopt rules and regulations governing the employment or education of trustworthy inmates outside the institutions and facilities under the jurisdiction of the Department, except that whenever the Department requests placement of inmates in a school of a reorganized school district, the approval of the board of education of that district shall be a prerequisite to such placement, and tuition shall be paid under the terms of Chapter 6 of Title 14. The 1976 amendment, among other changes, substituted "shall" for "may".

This statute permitted, and later required, the Department to create and maintain a work release program. I do not believe that the Courts of Delaware would construe it, however, as bestowing on any individual inmate a legally enforceable claim to work release status. Moreover, I reach the same conclusion with respect to rules adopted by the Department of Corrections pursuant to this statutory authority. The rules in effect at the time of the initial turndown were entitled "Criteria and Procedure for Statewide Work Education Release". While they state general criteria of eligibility,[4] it is apparent that they were not intended to substitute an exclusive list of

4.	I.	Basic Criteria, All Institutions:

1. Within one year of release or parole eligibility date.

2. Demonstrated interest in personal improvement; progress toward increased maturity and self understanding. This will be evaluated on basis of inmate's work habits, program participation and general adjustment.

II.	Basic Procedures:

1. Written application is submitted by inmate, following which it is considered by and must be approved successively by:

a. Classification team
b. Work/education release staff
c. Superintendent

III.	Variations:

1. Delaware Correctional Center

a. Applicant must be assigned to Minimum Building before he can apply.
b. Application is made to the Minimum Classification Team first, then to the Institutional Classification Team.

2. Sussex Correctional Institution

Classification Committee makes final decision.

3. Women's Correctional Institution

No variation from basic.

IV.	Specific Criteria for Admission to Plummer Center:

1. Six months to parole eligibility or release.

2. Sufficient experience in the work/education release program at the institution to have demonstrated a stable, dependable work and adjustment record.

3. Family or personal history associated with Wilmington area.

4. A score of at least 34 points on the scoring tool used by Plummer Center.

5. Approval by the Director, the Superintendent of the institution, and the State Work Release Supervisor in the case of any inmate with a sex crime or crime of violence.

NOTE:	Exceptions can be made to all of the above procedures. Exceptions must be approved by the Superintendent and Supervisor for Work/Education Release. If there is a conflict between these two, it is to be resolved by a committee of the Superintendent, State Supervisor for Work/Education Release, and Assistant Director for Community Services.

objective requirements for the discretion of the prison administration. They refer only to institutional adjustment, for example, and make no mention of other obviously relevant consideration such as the prognosis for behavioral adjustment, risk of flight, and the personal safety of the inmate after admission to work release. I mention these relevant factors not because I am persuaded that they should or did influence any decision in plaintiff's individual case, but rather for the purpose of demonstrating that the rules established only minimum guidelines for eligibility and did not deprive the work release program of its essentially discretionary character. Similar observation could be made about the other guidelines which have been in effect between September of 1974 and the present time.

The conclusion that the statute and rules gave Winsett no legally cognizable claim of entitlement to work release under Delaware law is dispositive of his claim that he has been denied due process of law. If a prisoner has no legally cognizable claim of entitlement, there is no liberty interest, the denial of which would bring the Due Process Clause into play. *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). As the Supreme Court observed in *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), in the context of federal incarceration:

> In *Meachum v. Fano* . . . , for example, no due process protections were required upon the discretionary transfer of state prisoners . . . . The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process.

429 U.S. at 88, fn. 9, 97 S.Ct. at 279.

Both *Meachum* and *Daggett* involved procedural rather than substantive due process claims. But the Supreme Court's recent analysis in the substantive due process area suggests to this Court that a protected liberty interest must also be identified before substantive due process comes into play and that one's interest in being free of arbitrary state action is not, per se, a protected liberty interest. *Kelly v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). In *Meachum*, the court stressed the fact that a lawfully incarcerated prisoner has already been deprived of his liberty through due process of law and concluded that his interest in participation in less restrictive custody is not a protected liberty interest absent some state created claim of entitlement. The court's approach suggests to me that its view would be the same in the context of substantive as well as procedural due process. As the court observed in *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976):

> . . . As long as the conditions or degree of confinement to which the prisoner is subjected are within the sentence imposed upon him and are not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. . . .

427 U.S. at 242, 96 S.Ct. at 2547.

▆ Nor can I conclude that plaintiff is entitled to relief based on his equal protection claim. He has neither alleged nor proved any class based discrimination. He complains of individual decisions about his own conditions of confinement because they have been influenced by what he considers to be considerations unrelated to the purpose of the work release program.[5] Even if he were right, however, misapplications of State law do not constitute invidious discrimination which violates the Equal Protection Clause. As the Supreme Court observed in *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) "were it otherwise, every alleged misapplication of State law would constitute a federal question". Accordingly, I conclude that plain-

---

**5.** While plaintiff's argument is frequently cast in terms of "impermissible reasons" having played a part in the denial of work release, he does not, and could not on this record, main-
tain that they have come as a result of his exercise of a First Amendment or other constitutionally secured right or, as noted above, because of a suspect classification.

tiff's equal protection claim is also without merit. *See Durso v. Rowe,* 430 F.Supp. 49 (N.D.Ill.1977) which rejects an equal protection claim on substantially identical facts.

Judgment will be entered for the defendants.