617 F.2d 996
 Thomas H. WINSETT, Appellant,
v.
F. Earl McGINNES, Secretary of the Department of Health and
Social Services; Paul W. Keve, Director of the Delaware
Division of Adult Corrections; Raymond W. Anderson,
Superintendent of Delaware Correctional Center; Donald R.
Davis, Deputy Superintendent of the Delaware Correctional
Center; Milton Horton, Acting Chief of Adult Corrections;
James T. Vaughn, Commissioner of Department of Corrections;
Walter W. Redman, Superintendent of Delaware Correctional Center.
 No. 78-1344.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 11, 1978.
Reargued En Banc Nov. 8, 1979.
Decided March 24, 1980.
 
 Arlen B. Mekler, Wilmington, Del. (argued), for appellant.
 John A. Parkins, Jr., Asst. Atty. Gen., Dept. of Justice, Wilmington, Del. (argued), for appellee.
 Argued Dec. 11, 1978.
 Before GIBBONS, VAN DUSEN and ROSENN, Circuit Judges.
 Argued Before Court En Banc Nov. 8, 1979.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal requires us to determine whether certain Delaware prison officials violated an inmate's constitutional rights when, because of their fear of adverse public reaction and legislative reprisals against the prison system, they denied his applications for work release.
 
 
 2
 Following the denial of his work release applications, the inmate, Thomas H. Winsett, brought a civil rights action in the United States District Court for the District of Delaware under 42 U.S.C. § 1983 (1976) and the fourteenth amendment to the federal constitution. In this action, Winsett sought compensatory and punitive damages as well as injunctive and declaratory relief. The prayer for injunctive relief, inter alia, sought to restrain the prison officials from considering possible public reaction and possible reprisal by the Delaware General Assembly when evaluating his future applications for admission to the program. Following a lengthy trial, the district court rejected Winsett's claims and entered judgment in favor of the defendants. This appeal followed.
 
 
 3
 We conclude that the request for injunctive relief is moot; that Winsett's prayer for damages is permissible as to two of the defendants, subject to certain findings to be made by the district court concerning official immunity and the measure of plaintiff's injury; and that his request for declaratory relief, insofar as it is a predicate to damages, should be granted if the trial court finds that damages may be awarded. Accordingly, the district court judgment will be vacated in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
 
 I.
 
 4
 Winsett was convicted in 1964 and sentenced to life imprisonment for the felony murder of Robert Paris, a Delaware State Police Officer. The killing aroused a pervasive public outrage throughout the state.[1] As certain prison officials would later put it, "Winsett (was) singled out for more public and political attention than other inmates we know of (,) even those whose crimes were more serious. . . ."
 
 
 5
 Winsett was duly confined in the Delaware Correctional Center to begin his sentence. During the next ten years leading up to the initiation of this litigation, Winsett was a model prisoner. He pursued courses in heating and air conditioning, did maintenance work for the prison, wrote weekly articles about prison life in a prison newspaper, and got along well with other inmates and officers. On September 16, 1974, believing himself to be sufficiently rehabilitated to adjust to life outside the prison, Winsett requested classification to work release status. 425 F.Supp. at 610. Work release is a program by which prisoners are permitted to maintain employment in the community while still under correctional supervision. Releasees return to a correctional institution or a residential center after the completion of each workday. The work release program in Delaware is governed by 11 Del.C. § 6533(a). That section, at the time of Winsett's initial application, provided:
 
 
 6
 (a) The Department may adopt rules and regulations governing the employment or education of trustworthy inmates outside the institutions . . . except that whenever the Department requests placement of inmates in a school of a reorganized school district, the approval of the board of education of that district shall be a prerequisite to such placement. . . .[2]
 
 
 7
 Pursuant to this statutory authority, the Delaware Department of Corrections adopted a set of rules, also applicable at the time of Winsett's September 1974 application for work release.[3] Together, the statute and the rules established a vital rehabilitative system, one which the Delaware Division of Adult Corrections has acknowledged as among "the final steps in . . . provid(ing) treatment and training of inmates with an end result of their being able to take their place in society as law-abiding citizens upon their release."
 
 
 8
 Approval for work release requires the concurrence of three levels of decisionmakers. A prisoner must first apply to an appropriate "classification team." In Winsett's case, this first level review was carried out by the Minimum Security Building Classification Team. That team approved his application for work release. Its recommendation was then forwarded to the so-called Institution Classification Committee which also approved Winsett's application. 443 F.Supp. at 1370; 425 F.Supp. at 610.
 
 
 9
 As Winsett's application was working its way up to Superintendent Raymond W. Anderson for his final approval, public opposition to granting work release to Winsett became increasingly evident. One manifestation of this growing opposition was an August 7, 1974 letter addressed to Delaware Correctional Center Superintendent Anderson and written by Delaware State Senator Cicione. The letter strongly condemned what the Senator believed to be Anderson's intention to prepare Winsett for work release. "As a State Senator," the author declared, "I demand that you reconsider and retract the actions already taken and take immediate steps to return Winsett to the ranks of regular prison restrictions."
 
 
 10
 The letter elicited an equally strong response from Superintendent Anderson. On August 8, 1974, more than a month before Winsett applied for work release, defendant Anderson wrote the Senator, informing him that "as long as I am Superintendent of the institution, I shall never be able to entertain any requests from Tom (Winsett) in regards to Work Release. . . ." The Senator "greatly appreciated" this response and "commend(ed Anderson) for (his) stand on not allowing Mr. Winsett to participate in the work-release program." On September 26, 1974, Superintendent Anderson rejected Winsett's application for work release.
 
 
 11
 Thereupon, on October 15, 1974, Winsett initiated this action. He alleged that the defendants' decision was predicated on the "sensitivity" of his offense, and charged that such a factor is "a legally impermissible" basis for evaluating work release applications. Winsett proceeded against F. Earl McGinnes, Secretary of the Delaware Department of Health and Social Services, Paul W. Keve, Director of the Delaware Division of Adult Corrections and later Acting Commissioner of the Delaware Department of Corrections, Raymond W. Anderson, Superintendent of the Correctional Center, and Donald Davis, Deputy Superintendent of the Delaware Correctional Center.[4]
 
 
 12
 While this action was pending in the trial court, Winsett applied a second and third time for work release. His second application, filed in early March of 1976, was approved by both the Minimum Security Building Classification Team and the Institution Classification Committee. However, Milton Horton, then Assistant Director of the Adult Division, recommended that Winsett's "application be deferred until (a) decision on (the) transfer" was made.[5] Paul Keve, who was Acting Commissioner of the Department of Corrections at the time, agreed and the application was deferred, but was formally recorded as a denial.
 
 
 13
 Winsett filed his third and final application for work release in November, 1976. Again he was approved by the Minimum Security Building Classification Team and the Institution Classification Committee. A third committee, newly created by the General Assembly and entitled the Institutional Release Classification Board, also approved Winsett's application. The application was vetoed, however, by Milton Horton, now Assistant Bureau Chief of Adult Correction. Horton advanced three reasons for his veto decision: (1) the seriousness of the offense; (2) the lack of a certified parole release date, which he believed was required by the existing guidelines; and (3) Winsett's previous history of model conduct during incarceration in other institutions for offenses committed prior to the Paris murder, and that his good conduct during his present incarceration should therefore be given less weight. This veto was approved by then Commissioner James T. Vaughn.
 
 
 14
 Following the denials of Winsett's second and third applications for work release, additional defendants Milton Horton, James Vaughn, and Superintendent Walter W. Redman were joined in the action.[6] On December 30, 1976, the district court, in a preliminary jurisdictional ruling, held that plaintiff's request for injunctive relief, insofar as it sought his immediate admission to work release, would be denied. 425 F.Supp. at 613. The court based its ruling on the Supreme Court's decision in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), which held that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus(,)" with the attendant requirement of exhaustion of state remedies. Id. at 500, 93 S.Ct. at 1841. Winsett has not appealed from that decision. The court also held that Winsett's claims for damages, and for declaratory relief as a predicate to damages, could be entertained on the merits. 425 F.Supp. at 612-13. Implicitly, the court further held that, insofar as Winsett's plea for injunctive relief was intended not to secure his immediate release but simply to prevent the future application of impermissible standards in evaluating his work release requests, that injunctive action could be heard in a federal forum.
 
 
 15
 Winsett's case went to trial on July 21, 1977. At the outset, his lawyer made clear that the primary objection was to the allegedly impermissible standards used in rejecting Winsett's applications for work release. Superintendent Anderson acknowledged the correspondence with Senator Cicione, and admitted that the Senator's Chairmanship of the Joint Finance Committee was a matter of particular concern to the administration of the corrections system. He also acknowledged that he had been aware of the possibility that Paul Keve might not be confirmed by the Senate, given its displeasure with the prison system. Anderson was also examined with respect to his answers to certain interrogatories which seemed to indicate that his rejection of Winsett's initial application was influenced primarily by public pressure in general and the complaints of "(t)he State Police and certain Senators" in particular.
 
 
 16
 Appellee Keve's testimony was even more revealing. The Legislature, Keve noted, had given the corrections department certain privileges pertaining to programs such as work release and furloughs and had amply demonstrated to him "its readiness very quickly to withdraw such privileges . . . whenever there was disappointment on their part with the way that the Department exercised these." Keve saw his role as one of protecting the "inmate population as a whole" where their privileges might be jeopardized by actions taken in a particular case. Although he did not think that his rejection of Winsett's second application was influenced by the Legislature's possible refusal to confirm him as Commissioner, he admitted that he was conscious of this hazard. However, he satisfied himself that he adhered to decisions which he conscientiously regarded "as right and best for the Department rather than those decisions which simply would protect my job."
 
 
 17
 Keve acknowledged that if he had taken steps toward granting Winsett work release, relations between the prison system and the legislative leadership would have suffered.[7] Indeed, he noted, the rejection of Winsett's second application had nothing at all to do with the existing eligibility criteria. Rather, it was the result of "intense legislative pressure." Had it not been for this pressure, Keve admitted, Winsett would have gone on work release. Although this pressure apparently was not formal legislative action, it was very difficult for him to take "any kind of decisive action in that particular job without incurring some displeasure of somebody and very, very frequently legislators." He knew he could expect some "praise from one kind of legislator and intensive criticism from another kind." He therefore had to weigh Winsett's best interests and the effect of his release on the overall program and other inmates.[8] The trial court rendered its decision on January 31, 1978. It found that the denials of Winsett's first and second applications for classification to work release "were motivated at least in substantial part by prison officials' concern about a possible retaliation by the Delaware General Assembly." 443 F.Supp. at 1371. In the case of the second denial, the court was convinced that "Acting Commissioner Keve believed that he had an alternative approach to work release which would better serve Winsett's interests." Id. The court further found that the rejection of Winsett's third application "was not motivated by (a) concern with possible retaliation by the General Assembly or by a concern for public reaction." Id.
 
 
 18
 Although it found the first two rejections to have been largely the product of prison officials' concern of possible legislative retaliation, the trial court nevertheless held that neither Winsett's due process nor equal protection rights had been violated. To invoke a due process claim, the court noted, a party must first establish that he had a protectible interest. Surveying the work release statute and the regulations promulgated thereunder, the court rejected Winsett's contention that they created a vested state law right to which due process should attach.
 
 
 19
 The trial court also rejected Winsett's equal protection claim. It held that his failure to allege or prove any class-based discrimination precluded recovery under the Equal Protection Clause. Accordingly, although it acknowledged the rather striking irregularities in the first two refusals of his work release applications, the trial court denied all of Winsett's requests for relief.
 
 
 20
 Winsett appealed. On May 17, 1977, while the appeal was pending, Winsett was granted parole with the condition that he be transferred to a correctional institution in another state and serve four years in that institution prior to his release to parole supervision. On November 16, 1978, Winsett was transferred to Kilby Correctional Facility near Montgomery, Alabama. As we explain in more detail below, this transfer measurably changes the scope of available relief.
 
 II.
 
 21
 We note at the outset that whatever may be the defendants' substantive liability, Winsett's demand for injunctive relief is now moot. The only injunction sought by Winsett in this appeal is one to restrain the defendants from continuing to rely on allegedly impermissible criteria in evaluating his future applications for work release. Because Winsett has now received a conditional parole, is no longer subject to Delaware's jurisdiction, and shows no interest in returning,[9] his injunctive request no longer implicates "an actual controversy . . . at (this) stage . . . of review . . . ." Steffel v. Thompson, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974).[10] There is no evidence on the record suggesting that Winsett is currently harmed in any respect by whatever legislative animosity influenced past evaluations of his work release petitions. Cf. Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (even though injunction was dissolved with the end of a strike, employers still retained sufficient interests and injury to warrant declaration that state welfare benefits plan for strikers was invalid); Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 178, 89 S.Ct. 347, 350, 21 L.Ed.2d 325 (1968) (court decision continues to affect official response to rally). Nor do we have any reason to suppose that there may be future occasions on which Winsett will again confront similar treatment. Cf. Southern Pacific Terminal Co. v. I. C. C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911) (short term orders of ICC are capable of repetition, yet evading review). Furthermore, Winsett did not file his complaint as a class action, in which the need for injunctive relief often survives the mootness of the class representative's interest. See, e. g., Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).
 
 
 22
 Winsett's transfer to Alabama vitiates any need to enjoin the application of allegedly impermissible criteria in his case, and because none of the exceptions to the traditional mootness doctrine is present, we will vacate the district court's disposition of plaintiff's injunctive claim and remand with a direction to dismiss.[11] United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950).
 
 III.
 
 23
 Although Winsett's claim for injunctive relief is now mooted, his claims for damages, and for declaratory relief as a predicate to damages, are not. Although he has not demonstrated that the threatened application of impermissible criteria poses any likelihood of ongoing or prospective harm, it is conceivable that past applications may give rise to damages. For example, prison officials acknowledged at trial that work release may favorably affect an inmate's chances for an early parole. In addition, work release is a source of wages for the working inmate. Where such claims remain, the foreclosure of injunctive relief does not moot a party's entire cause of action.[12] We therefore turn to Winsett's substantive attack on the allegedly impermissible criteria applied in his applications for work release.
 
 A. Due Process
 
 24
 Winsett argues in this court, as he did in the district court, that the Delaware Department of Correction, by establishing a work release program and by promulgating standards for its administration created a protectible state law interest in participation in the program by eligible inmates. He contends that the use of impermissible criteria by the Department in denying him access to the work release program denied him his right to "liberty" guaranteed by the fourteenth amendment.
 
 
 25
 Winsett's due process claim has both procedural and substantive overtones. It is procedural in the sense that the alleged use of impermissible criteria by the Department denied Winsett of the process of work release application review required under the Delaware regulations. His due process claim is substantive in the sense that regardless of any procedural rights, the application of impermissible criteria deprived him, as contrasted with other eligible inmates, of access to the work release program. Regardless of whether Winsett's due process claim is substantive, procedural, or an amalgam of both, he must have a protectible liberty or property interest in order to invoke the protection of the fourteenth amendment. We therefore first consider whether any protectible fourteenth amendment interest is implicated in the Delaware work release program.
 
 
 26
 It is well-settled that when a person is lawfully incarcerated for the conviction of a crime, that person's constitutional rights become circumscribed. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1059, 92 L.Ed. 1356 (1948). The Supreme Court has been careful to indicate, however, that although a prisoner's rights "may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisoners of this country." Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).
 
 
 27
 Inasmuch as a prisoner's liberty is most directly implicated by his imprisonment, the Supreme Court has struggled to define the extent of a prisoner's fourteenth amendment liberty interest. The Court has been generally reluctant to find a constitutionally protected liberty interest while a prisoner is still under actual confinement.[13] In Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Court held that no protectible liberty interest was implicated when prison authorities sought to transfer a prisoner from one facility to another. Most recently, in Inmates of the Nebraska Penal Correctional Complex v. Greenholtz, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Court held that no liberty interest was implicated by the mere existence of a state parole system. Although the Court had held in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) that a liberty interest was implicated in parole revocation procedures, the Court in Greenholtz drew a crucial distinction between parole revocation which deprives one of the liberty one has and discretionary parole release which denies a conditional liberty that one desires. 442 U.S. at 9-10, 99 S.Ct. at 2104-2105. Thus, there is no constitutionally mandated right to enter a discretionary parole release program.
 
 
 28
 Even if the Constitution is not the source of a prisoner's potential liberty interest in various aspects of his confinement, the Supreme Court has been willing to extend fourteenth amendment protection when a state has itself created a liberty interest in the form of a specific guarantee. In Wolff, supra, the Nebraska legislature had provided for a "good-time credit" system under which a prisoner's sentence could be reduced for good behavior. Under this system, good-time credits could only be forfeited through "serious misconduct." The Court held that because the state created the right to good-time credits which could only be removed if the prisoner engaged in serious misconduct, "the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." 418 U.S. at 557, 94 S.Ct. at 2975. Indeed, the Court's non-recognition in Meachum of a constitutional liberty interest in prison transfers must be viewed in light of the absence of any state-created right to remain in the prison of original commitment. See 427 U.S. at 226-27, 96 S.Ct. at 2539.
 
 
 29
 But the Court in Greenholtz acknowledged that although there was no constitutionally cognizable liberty interest in access to a discretionary parole system, "the expectancy of release provided for in (the Nebraska parole) statute" may be entitled to some measure of constitutional protection. 442 U.S. at 12, 99 S.Ct. at 2106. The Court cautioned, however, that the existence of a statutorily created liberty interest depends upon the statutory language and "must be decided on a case-by-case basis." Id.
 
 
 30
 From this review of Supreme Court precedent, it becomes evident that Winsett's claim of a liberty interest in participation in the Delaware work release program must be grounded either in the Constitution or in the statutorily-set schema for work release in Delaware. Winsett does not press for a constitutionally-based liberty interest in work release. He also concedes that the language of 11 Del.C. § 6533 does not create a protected interest entitling him to participate in the work release program. The fundament of his claim is the set of regulations promulgated by the Department to implement the basic legislative grant of authority to create a work release program. It is this set of comprehensive regulations which Winsett claims creates the liberty interest subject to fourteenth amendment protection.
 
 
 31
 Initially, we do not believe that Winsett's concession that the statute itself does not create the state-created right is fatal to his case, for we believe the right may be established in the regulations implementing the statute. In Durso v. Rowe, 579 F.2d 1365 (7th Cir. 1978), cert. denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), the Seventh Circuit, although declining to find a liberty interest in a work release statute, nevertheless held that if the prisoner could establish as a matter of practice that his work release program would not be revoked absent a rule violation, he had an interest protected by due process. Id. at 1371. Therefore, under Durso, the Due Process Clause may be triggered in a work release program not only by statutorily created rights but also by official policies or practices. This is precisely the basis of Winsett's argument. We must therefore turn to the regulations governing work release in Delaware to ascertain if they have created a protectible liberty interest.
 
 
 32
 The district court in the instant case declined to find a state-created liberty interest because, even though Winsett met all the criteria for eligibility, it believed that the work release statute and regulations did not deprive the program of its "essentially discretionary character." 443 F.Supp. at 1373. Although it acknowledged Winsett did meet all the criteria for work release but was denied work release status by the exercise of the prison officials' discretion, the court concluded Winsett never had any state-created entitlement to work release. We disagree.
 
 
 33
 The work release statute and the regulations envision the grant of work release when a prisoner meets certain eligibility criteria and the prison authorities, exercising their sound discretion, concur that work release is appropriate. The presence of discretion on the part of the prison authorities in the work release program does not negate the possibility that a state-created entitlement to work release may exist, because we do not view the prison authorities' discretion as absolute. If the prison authorities could by the arbitrary exercise of discretion deny a work release application to a prisoner even though he met all eligibility requirements, then any entitlement to work release would be illusory rather than real. The trial court apparently perceived the discretion vested in the Delaware prison authorities as unbridled, rendering any claim of entitlement to work release an illusion. We are not persuaded, however, that the Superintendent's discretion under the state regulations in granting work release is as boundless as the trial court believed.
 
 
 34
 The authority of the Department of Corrections to adopt regulations governing work release stems from the work release statute, 11 Del.C. § 6533(a). Although the trial court may be correct that the regulations adopted do not exhaust the criteria pertinent to a decision whether or not to grant work release, it is by no means clear that the Superintendent may, under the rules, invoke any criterion he chooses. First, the state has established an elaborate institutional system for processing work release applications, a system that at various times has included at least two and sometimes three separate committees whose recommendations were forwarded to the Superintendent. We cannot believe that those committees, whose function apparently involved making rather detailed evaluations of inmates' fitness for work release, were intended to be overridden for any reason chosen by the Superintendent, however unrelated to the statutory purpose of section 6533.
 
 
 35
 More critically, 11 Del.C. § 6533(a), under which the regulations were promulgated, is itself subordinate to section 6531, which sets forth the programs including work which the Commissioner must establish, and the purposes those programs must serve. That section provides, in pertinent part:
 
 
 36
 Persons committed to the institutional care of the Department shall be dealt with humanely, with effort directed to their rehabilitation, to effect their return to the community as safely and promptly as practicable. The Commissioner shall establish the following programs, and may establish others: Education, including vocational training; work; case work counselling and psychotherapy; library and religious services; commissary; and shall institute procedures for the study of classification of inmates for these purposes.
 
 
 37
 The regulations promulgated under section 6533(a) must thus satisfy the broad dictates of section 6531: "humane" treatment, "rehabilitation," and "return to the community as safely and promptly as practicable." Thus, these are benchmarks which delineate the perimeters of the Superintendent's exercise of discretion, unlike Meachum v. Fano, supra, where the discretion to transfer under state law was absolute. Here, the "regulations imposed on the (Superintendent) indicate that discretion may be exercised only within established parameters." Tracy v. Salamack, 572 F.2d 393, 395 n.9 (2d Cir. 1978).
 
 
 38
 The trial court correctly noted that some other relevant considerations among which it included the prognosis for the inmate's behavioral adjustment, the risk of flight, and the inmate's personal safety are not specified in the regulations. But those were not the considerations which the trial court found to have motivated the prison officials in evaluating Winsett's first two applications. Had they been, they could certainly have been justified as consistent with the policies of section 6531. Instead, the underlying reason for the adverse decisions on Winsett's applications was a lurking fear that an approval would possibly invoke unfavorable public reaction and legislative reprisal. This fear was sparked by communication from one or more of the legislators. Although these reasons may have significance in the broad administration of a prison system, no place has been provided for their consideration in the exercise of discretion whether to grant or deny a prisoner work release under the regulatory provisions.
 
 
 39
 The trial court's reasoning, which apparently would limit protectible interests solely to those which can be described as vested rights, effectively arrogates to the States the power to devise both the interests protectible by due process and the process which is due. Thus, in the trial court's view, whenever a State conditions an otherwise protectible interest on the outcome of a highly discretionary process, however arbitrary and inadequate in practice, the interest is defeasible and not entitled to due process safeguards. Such a construction of the relevant law is unacceptable. Meachum v. Fano, supra, does not entail such a construction. There, after all, the Court noted that there was no state statutory predicate whatsoever for the right to remain in one prison until certain specified events occurred. Thus, however vital to an inmate's interests was the desire to remain in one prison, there was no state-sponsored expectation interest which due process would protect.
 
 
 40
 In Delaware, there are specific criteria for work release which we believe if met, give rise to a liberty interest in work release. Although discretion is vested in the prison authorities to grant or deny work release, that discretion must be exercised consistently with the purpose and policy behind work release. We hold that a state-created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulations and the exercise of the prison authorities' discretion is consistent with work release policy. We conclude that Winsett had a protectible liberty interest in work release because he met all eligibility criteria under the Delaware regulations and the considerations influencing the discretionary denial of work release, namely concern for public reaction and fear of legislative reprisals, were outside the legitimate bounds of the prison officials' discretionary power. In other words, had they acted within the permissible scope of their discretion, Winsett would have been granted work release. To hold otherwise, would mean that the state-created interest in work release for eligible prisoners could be overridden simply by the prison officials' abuse of discretion. We therefore conclude that Winsett had a liberty interest protectible under the fourteenth amendment's guarantee of due process.
 
 
 41
 Having concluded that Winsett has a protectible state-created interest in work release, we must now consider whether its denial could have violated the fourteenth amendment's guarantee of due process. Winsett's argument is primarily substantive in nature. The consideration of impermissible criteria, fear of public outcry and legislative reprisal, brought different treatment to Winsett than any other applicant to the work release program. We, however, perceive Winsett's argument as more properly implicating procedural due process rights. If the prison officials considered the extraneous criteria of public opinion and legislative reaction, the normal procedure for considering work release applications was distorted to Winsett's detriment. Under the work release program, the applicant is entitled to have his application approved if all eligibility criteria are met and the prison authorities approve the application. If the authorities do not properly exercise their discretion, the process due under the work release program is denied.
 
 
 42
 We believe that Winsett has made out a case of deprivation of his procedural due process rights in the denial of his first two work release applications. The district court found, as we have previously noted, that Winsett's first and second applications for work release were rejected, at least, in substantial part by prison officials because of a fear of legislative reprisals against the prison system as a whole. The State of Delaware does not contend that these findings were clearly erroneous. We can only conclude that in considering the extraneous criteria, Superintendent Anderson and Commissioner Keve violated the procedure to be accorded Winsett's work release application, and that Winsett has a cause of action against them for the alleged deprivation of procedural due process.[14]
 
 B. Equal Protection
 
 43
 The trial court rejected plaintiff's equal protection attack on the criteria applied to his work release requests. It did so on the ground that Winsett did not allege a class-based discrimination. Because we have found those criteria impermissible on due process grounds, we express no views on Winsett's equal protection contentions.
 
 IV. Official Immunity
 
 44
 Because the district court found that no constitutional rights were violated, it did not have occasion to reach the issue of the applicability of the good faith immunity defense to Commissioner Keve and Superintendent Anderson. The defendants contend that even if this court finds that Winsett's constitutional rights were violated, we may not assess damages against Commissioner Keve. Relying on the Supreme Court's decisions in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), defendants argue that Commissioner Keve enjoys an official immunity from recoveries in damages. They also observe that should we find Superintendent Anderson liable, we must remand to the district court for findings as to Anderson's possible immunity. Because the district court made no findings as to either Keve or Anderson's immunity, we believe it necessary to remand the case to the district court.
 
 
 45
 In Wood v. Strickland, supra, the Supreme Court recognized a qualified immunity for school board members. The Court held that
 
 
 46
 a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.
 
 
 47
 420 U.S. at 322, 95 S.Ct. at 1001. More recently, in Procunier v. Navarette, supra, the Court applied Wood to an inmate's section 1983 damage action against prison officials. It also made clear that Wood established two separate grounds for rejecting official immunity in a particular case. First, the Court stated:
 
 
 48
 (T)he immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm.
 
 
 49
 434 U.S. at 562, 98 S.Ct. at 860.
 
 
 50
 On remand, the district court should consider whether, even though we have found the denial of work release by defendants Anderson and Keve to be constitutionally infirm, they are entitled to the benefit of good faith immunity for actions of officials when they are sued for damages pursuant to section 1983. In that connection, it clearly will be relevant for the court to consider whether the interest which they violated was "clearly established at the time of their challenged conduct," and whether there were any other factors which could have given them reason to know that their conduct was constitutionally defective.
 
 
 51
 The second branch of the Wood decision authorizes liability when the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." Procunier, supra, 434 U.S. at 566, 98 S.Ct. at 862. "This part of the rule," the Court has observed, "speaks of 'intentional injury,' contemplating that the actor intends the consequences of his conduct." Id. The court will also need to consider whether its finding that "Commissioner Keve believed that he had an alternative approach to work release which would better serve Winsett's interests," 443 F.Supp. at 1371, should shield him from liability under the second branch of the Wood formulation of good faith immunity. The record amply corroborates Keve's efforts to obtain for Winsett a transfer to the Corrections Department in Minnesota, a transfer which he expressly believed would result in an earlier, and safer, parole. Although Winsett may well have been injured through a loss of earnings and a denial of early parole, the record may preclude a finding on remand that Commissioner Keve acted maliciously toward Winsett.
 
 
 52
 We agree with the defendants that the case must be remanded to the trial court for findings as to possible malice on the part of Superintendent Anderson. Winsett does not challenge this suggestion. We believe that there is ample evidence in the record from which the district court may make the requisite findings with respect to the applicability of the good faith immunity defense and that there is no requirement to adduce any additional testimony. Accordingly, we will remand the case to the district court in order that it make the requisite findings as to Anderson's liability in damages under the malice test articulated in Wood.
 
 V. Proof of Actual Damages
 
 53
 Because it believed that the defendants' rejection of Winsett's work release applications violated none of his constitutional rights, the trial court had no occasion to assess what damages Winsett may properly collect. On remand, the trial court, if it finds Anderson and Keve liable, shall ascertain the appropriate measure of damages.
 
 VI. Conclusion
 
 54
 We are not unmindful that sixteen years ago, Winsett was found guilty of the wanton slaying of a Delaware State Police officer. The public outrage generated by that murder apparently has not yet subsided. However, the strength of our legal system is the recognition of the right of all American residents to have their individual cause even though it be merely an interest in a rehabilitation process considered on its merits. The right to due process is fundamental in our legal system and must, of necessity, preclude consideration of impermissible reasons. Due process may not be sacrificed because of public outrage and blinding passions of society. Public outrage may at times perform a useful function in our society, but it serves no purpose in fairly and objectively judging the merits of a person for access to a rehabilitation program.
 
 
 55
 Accordingly, the judgment of the district court will be reversed insofar as it dismisses Winsett's action for damages against Superintendent Anderson and Commissioner Keve, affirmed insofar as it dismissed Winsett's damage claim against Commissioner Vaughn, Superintendent Redman, and Assistant Bureau Chief Horton, and in the denial of injunctive relief on the ground of mootness. The case will be remanded for further proceedings not inconsistent with this opinion.
 
 
 56
 Each side to bear its own costs.
 
 
 57
 WEIS, Circuit Judge, dissenting.
 
 
 58
 I would affirm the judgment of the district court. The case is now reduced to a damage suit against two individuals, Anderson and Keve, resting on two separate incidents, Anderson's rejection of Winsett's application for work release in 1974, and Keve's veto in 1976. Although the liability theory underlying each is the same, it is desirable to treat the claims against the defendants separately. I believe the record requires a conclusion that Keve is entitled to official immunity and that the plaintiff has not established a claim against Anderson.
 
 
 59
 A court should not decide a constitutional question if the record supports some other ground that would obviate the need to make such a determination. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). In my view, it is consistent with this policy to decide a case, when possible, on the basis of immunity, and I therefore apply that rationale to Keve's case. As to Anderson and the 1974 incident, however, the findings of the district court are not sufficient to support a decision on immunity at this point. Thus, it is necessary to address the constitutional issue in his case. Although this prevents complete avoidance of the constitutional question, deciding Keve's immunity confines the liberty interest inquiry to Anderson's case.
 
 I.
 
 60
 I would not remand the case to the district court for specific findings on the immunity of defendant Keve. I agree that the guidelines discussed by the court, particularly the two-step analysis set out in Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), are the considerations that apply. In my view, however, the record is adequate to make the determination in this court. For example, in Reese v. Nelson, 598 F.2d 822 (3d Cir. 1979), we analyzed the record in a case submitted to a jury and found that the evidence required a finding of immunity as a matter of law. Here, by contrast, the task of evaluating the immunity issue is less complex because we have the benefit of the district judge's findings and opinion.
 
 
 61
 The first step is to decide whether a clearly established constitutional right should have been apparent to Keve in 1976. That assumes, of course, that such a constitutional right exists, a premise I accept only arguendo. The majority opinion does not cite any cases handed down before 1976 even arguably close to the circumstances present here, nor has my research uncovered any such authority. No Supreme Court case to that date had discussed the subject of conditional release eligibility, nor were there any opinions of this court holding that such an interest was protectible. Accordingly, there is nothing to demonstrate that the interest that Keve arguably violated was "clearly established at the time of (the) challenged conduct." Procunier v. Navarette, supra at 562, 98 S.Ct. at 860. Because he could not reasonably have been expected to be aware of a constitutional right that had not yet been judicially declared, Keve did not act in disregard of established law.
 
 
 62
 The second inquiry of the immunity analysis is subjective whether the defendant acted with malicious intent to cause a deprivation of constitutional rights or other injury to the plaintiff. Stated inversely, "The official himself must be acting sincerely and with a belief that he is doing right . . . ." Wood v. Strickland, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).
 
 
 63
 The trial court credited Keve's testimony that because of the likely public and legislative reaction to the plaintiff's work release status, Winsett faced far more hazards than other inmates. Under these circumstances, it was more feasible to secure parole or work release after a transfer to another state, and Keve was negotiating such a transfer at the time he disapproved Winsett's application. The court said, "In the case of the second denial, I am convinced Acting Commissioner Keve believed that he had an alternate approach to work release which would better serve Winsett's interests." Winsett v. McGinnes, 443 F.Supp. 1369, 1371 (D. Del.1978). This finding belies any inference of malice on the part of defendant Keve and satisfies the subjective test of sincerity and a "belief that he is doing right." Having met both phases of the immunity test, Keve is entitled to the judgment entered in his favor by the district court.
 
 II.
 A.
 
 64
 Since Anderson's conduct occurred two years before Keve's, it is even more apparent that the former meets the requirements under the first phase of the immunity inquiry. But I cannot complete the second step in the analysis because the district court did not make any findings on Anderson's subjective intent, and the record does not support appellate resolution of this question.
 
 
 65
 Anderson did testify that he declined to approve the work release application because he feared for Winsett's safety. This apprehension was the result of at least one telephone call to the prison threatening harm to Winsett if he were put on work release. Anderson attributed the threats to public reaction fueled by press reports, letters to the editor, and the opposition of the state police. The defendant bore Winsett no animosity and said that some years earlier he had offered use of his home to Winsett as a place to visit his son on Christmas Day. Indeed, in 1976, Anderson appeared in Winsett's behalf before the Parole Board to urge an out-of-state parole. The defendant testified that his job was protected by the merit system and denied that he succumbed to pressure from the state senator in Winsett's case.
 
 
 66
 Although Anderson's testimony would support a finding that he acted in subjective good faith, I do not have the benefit of the trial judge's credibility determinations and, consequently, cannot pass upon the defendant's immunity at this point.[1] I therefore turn to the issue of the alleged constitutional violation.
 
 B.
 
 67
 I start with the assumption that a discretionary work release program and discretionary parole system basically require the same analysis to determine if there is a protectible interest that invokes due process standards. The majority's reference to Greenholtz v. Inmates of the Nebraska Penal Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), leads me to believe that there is no disagreement between us on that score. We part company on whether the circumstances warrant finding that Winsett had a state-created liberty interest in an expectancy of work release status. In my view, the majority's conclusion is contrary to the Court's holding in Greenholtz.
 
 
 68
 In that case the Supreme Court addressed the question whether due process applies to discretionary parole-release determinations. Initially the opinion noted that decisions of the executive branch, especially with respect to the "sensitive choices" to grant parole, "however serious their impact, do not automatically invoke due process protection." 442 U.S. at 7, 99 S.Ct. at 2104. The "public interest purposes of rehabilitation and deterrence" may prompt the state to be either general or specific in enumerating the factors that the parole authorities should consider. "It is thus not surprising that there is no prescribed or defined combination of facts which, if shown, would mandate release on parole. . . . In each case, the decision differs from the traditional mold of judicial decision making" in that the parole determination is a "predictive judgment as to what is best for the individual inmate and for the community." Id. at 8, 99 S.Ct. at 2104. In that connection, the Court found that in passing on parole the decisionmaker must consider whether, in light of the nature of the crime, the inmate's release would minimize the gravity of the offense, weaken deterrent impact on others, and "undermine respect for the administration of justice." Id.
 
 
 69
 Two theories were proffered in support of the claim to due process protection of a prisoner's expectancy of release on parole: first, that the word "liberty" in the due process clause included a prisoner's interest in the possibility of parole whenever a state establishes a parole system; second, that the particular statutory language involved in the case gave rise to a state-created liberty interest in release on parole. The Court rejected the former but accepted the latter. It found a liberty interest created by a state statute directing that the Parole Board "shall order" a prisoner's release "unless" it found certain enumerated conditions to justify a denial.
 
 
 70
 The Court emphasized the essentially discretionary nature of parole but held that the "unique structure and language" of the statute under review created an expectancy of release that satisfied the claim to constitutional protection. As the majority recognizes, however, the Court stressed that "whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." Id. at 12, 99 S.Ct. at 2106. Thus, discretion in the granting of parole is the general rule and generates no protectible interest. Only when discretion is restricted by statutory language that mandates the parole authorities to grant release does a liberty interest come into being. It is the statute's command, not discretion, that creates the interest.
 
 
 71
 This, however, is not the test adopted by the majority. Instead the formula used is "that a state-created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulation and the exercise of the prison authorities' discretion is consistent with work release policy." Majority Opinion at 1007 (emphasis added). As I read it, Greenholtz does not recognize a protectible interest if the "discretion" is merely "consistent with" a state statute. The dissent in that case calls attention to the majority's use of the word "shall," 442 U.S. at 29 n.9, 99 S.Ct. at 2115 n.9, and as the Court of Appeals for the Second Circuit remarked in Boothe v. Hammock, 605 F.2d 661 (2nd Cir. 1979), "The 'shall/unless' formula was decisive for the Court." Id. at 664. The Second Circuit found that in New York, while guidelines were "used to structure the exercise of discretion," the state system did not establish a scheme whereby parole "shall be ordered unless specified conditions are found to exist." Id. Accordingly, no protectible interest arose. Other courts of appeals and district courts addressing the identical issue have adopted this interpretation of Greenholtz. See, e.g., Wagner v. Gilligan, 609 F.2d 866 (6th Cir. 1979); Shirley v. Chestnut, 603 F.2d 805 (10th Cir. 1979); Robinson v. Mabry, 476 F.Supp. 1022 (E.D.Ark. 1979); Austin v. Armstrong, 473 F.Supp. 1114 (D.Nev. 1979); Campbell v. Montana Board of Pardons, 470 F.Supp. 1301 (D.Mont. 1979).
 
 
 72
 In 1974 there was no mandatory language in the Delaware statute authorizing the promulgation of regulations. It merely stated that the department "may" establish such rules.[2] That is not enough. I would concede that rules using mandatory language would suffice, but I find no such wording here. The regulations merely list some general (not all-inclusive) standards. They speak in terms of "basic criteria" and "basic procedures." Nowhere is there language requiring that if these criteria are met the authorities "shall" grant work release status. Indeed, "basic procedures" state that approval must be given at three different levels. By no fair construction can this language be interpreted to mean that those approvals "shall" be given. See Shirley v. Chestnut, supra at 806-07.
 
 
 73
 I am convinced that the majority's "consistent with" test does not comply with the stringent requirements of Greenholtz, which I read as insisting upon "mandated by" or "directed by." Having failed to meet that standard, therefore, Winsett failed to establish a protectible interest. The only other way that a liberty interest could be created would be through the alternate theory of a prisoner's expectancy of conditional release expressly rejected in Greenholtz and by the majority here. That approach would build on Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and derive a liberty interest in the possibility of release from the Constitution itself.
 
 
 74
 The Morrissey Court held that a parolee's interest in not having his parole revoked is an interest protected by due process. Central to this holding was the parolee's reliance on at least an implicit promise that his freedom would be taken away only if he failed to live up to the parole conditions the "essence of parole." Id. at 477, 482, 92 S.Ct. at 2600. For this reason the Court concluded that the termination of parole liberty inflicts a "grievous loss" on the parolee. The interest in continued release, therefore, rose to the level of "liberty" protected by the due process clause independent of the statutory or regulatory language establishing the parole system.
 
 
 75
 In Greenholtz the claimants argued that the interest at stake in both a parole-revocation decision and a parole determination is the same, and the two situations should be accorded the same constitutional protection. 442 U.S. at 9, 99 S.Ct. at 2104. In rejecting this argument the Court again emphasized the predominately discretionary nature of parole and stressed the crucial difference between the grant and revocation of parole "being deprived of a liberty one has . . . and being denied a conditional liberty that one desires." Id. In addition, the Court noted that revocation of parole involved the comparatively simple task of resolving the factual question of whether a violation had occurred. The parole release decision by contrast may be made " 'for a variety of reasons and often involves no more than informed predictions' " as to what best would serve correctional purposes or the interest of the prisoners. Id. at 10, 99 S.Ct. at 2105, quoting Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1977).
 
 
 76
 The Court made it clear that the possibility of parole provides no more than a hope that it will be obtained. "To that extent the general interest asserted here is no more substantial than the inmate's hope that he (would) not be transferred to another prison, a hope which is not protected by due process." Id. at 11, 99 S.Ct. at 2105. To support this last point, the Court cited Meachum v. Fano, supra, where it was held that a prisoner could be transferred at the discretion of prison officials, "for whatever reason or for no reason at all." 427 U.S. at 228, 96 S.Ct. at 2540.
 
 
 77
 The practical effect of the holding in the case at bench given the lack of regulatory or statutory language limiting the discretion of the prison authorities is to find an implied promise in any work release program that an application will be denied only for cause. This is precisely the line of analysis that was rejected by the Greenholtz Court when it distinguished Morrissey, and I do not agree that Greenholtz should be circumvented in this fashion.[3]
 
 C.
 
 78
 Even if contrary to my view, the "consistent with" standard can be squeezed into the Greenholtz mold, however, I do not accept the majority's narrow reading of "work release policy." The majority finds this policy not in the regulations or in the enabling statute, but in § 6531 of title 11 of the Delaware Code, which governs in general the treatment of "persons committed to the institutional care of the Department (of Correction)." The statute provides that such persons are to be treated humanely and guided toward rehabilitation. I gather that in assessing work release applications, the majority would approve such factors as risk of flight, the inmate's personal safety, and the prognosis for the inmate's behavioral adjustment. See Majority Opinion at 1006-1007. Although it understandably does not attempt to delineate definitely the outer perimeters of matters it believes to be within the officials' discretion, "concern for public reaction," at least, is outside the pale.
 
 
 79
 I cannot accept this restriction because nothing in the enabling statute suggests that the Department of Correction was not to have very wide discretion in implementing a work release program, and the regulations themselves do not impose any stringent guidelines. In recognizing such matters as "what is best for the community," weakening deterrent effect on others, and undermining respect for the administration of justice as appropriate considerations for parole release, Greenholtz cannot be reconciled with the majority's view that it is improper for prison officials to allow "concern for public reaction" to enter into the determination of whether to grant work release privileges.[4]
 
 
 80
 Moreover, reliance upon § 6531, without any consideration of the standards for parole enunciated in § 4347, is an illogical limitation on the prison officials' discretion. Analogizing to the standards governing the parole decision would be appropriate since the regulations on work release refer to eligibility for parole and, obviously, the requirements for the two are interrelated. As shown in footnote 8 of the majority opinion, eligibility for parole was one of the critical factors affecting the decision to grant work release. According to the prison officials who testified at trial, the denial of parole after work release had been granted was a devastating experience for a prisoner, and, consequently, if early parole could not reasonably be anticipated, work release was contraindicated.
 
 
 81
 In Delaware, parole may be granted when there is a reasonable probability that the person can be released "without detriment to the community or to himself . . . . A parole shall be ordered only in the best interest of society . . . ." Del. Code Ann. tit. 11, § 4347 (Michie 1979). In the case of an offender convicted of first degree murder as is true of Winsett the immediate family of the victim may testify before the Parole Board. Id. § 4350(b). Others presenting "information or arguments to the Board" are to do so in writing. Id. § 4350(a). Thus, in Delaware, the decision to grant parole necessarily involves greater discretion than simply deciding whether "humane treatment and rehabilitation" are at stake. The Board may consider potential detriment to the community and the other factors listed in Greenholtz, including public opinion.[5]
 
 
 82
 If, as the majority holds, the improper exercise of discretion impinges upon a protectible interest, the bounds of legitimate discretion must be expanded to include consideration of the public interest in deterrence and respect for the administration of justice. Public opinion is not an impermissible factor.
 
 
 83
 The trial judge stated that the denial of Winsett's application was motivated, in substantial part, by "prison officials' concern about a possible retaliation by the Delaware General Assembly." Winsett v. McGinnes, supra at 1371. Whether the court referred to personal or institutional repercussions is not apparent from the opinion. In his testimony, Keve said that over the years the legislature had given the Department of Correction the privilege of implementing work release and furlough programs. But the legislature also had demonstrated that it would quickly revoke that power if the program proved disappointing. As Keve explained, he "had to be concerned with the inmate population as a whole and not exclusively with the advantage that should be given to any one case." He faced the possibility that anything done for Winsett that would smack of extra privilege "might cause legislative reaction that would cut back the privileges for all other inmates, and this was a distinct, you know, kind of jeopardy . . . ."
 
 
 84
 The point at which "legislative oversight" exceeds its proper limits and unduly infringes upon executive or agency action as well as individual interest is not always clearly marked. The majority feels that the boundary was crossed in this case and faults the two corrections officials for not stoutly resisting what is viewed as an invasion. Because they and not the invaders are defendants, it is the corrections officials who will be exposed to a damage assessment should their immunity defense fail in the trial court.
 
 
 85
 I cannot help but wonder if the court has reached this stage because it, too, has wandered outside its sphere by groping to find a protectible interest where none exists. Arbitrariness is anathema to the judicial mind. But carving out a due process right to work release because of its otherwise illusory character confuses what process is due with the question whether a protectible interest exists. Wolff v. McDonnell, 418 U.S. 539, 556-58, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974). I fear the court has disregarded Greenholtz's caution that "there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations." 442 U.S. at 7, 99 S.Ct. at 2104. In a similar vein, Meachum warned against "subject(ing) to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." 427 U.S. at 225, 96 S.Ct. at 2538.
 
 
 86
 I would affirm the judgment of the district court.
 
 
 
 [1]
 See Winsett v. McGinnes, 443 F.Supp. 1369, 1369-70 (D.Del.1978); Winsett v. McGinnes, 425 F.Supp. 609, 610 (D.Del.1976)
 
 
 [2]
 This section was somewhat revised by an Act of August 5, 1976, 60 Del.Laws, c. 705, codified in 11 Del.C. §§ 6533(a), 6533A. The changes do not affect the disposition of this case
 
 
 [3]
 The rules in effect at that time were entitled "Criteria and Procedure for Statewide Work Education Release." They provided:
 I. Basic Criteria, All Institutions :
 
 
 [1]
 Within one year of release or parole eligibility date
 
 
 [2]
 Demonstrated interest in personal improvement; progress toward increased maturity and self understanding. This will be evaluated on basis of inmate's work habits, program participation and general adjustment
 II. Basic Procedures :
 
 
 [1]
 Written application is submitted by inmate, following which it is considered by and must be approved successively by:
 a. Classification team
 b. Work/education release staff
 c. Superintendent
 III. Variations :
 
 
 [1]
 Delaware Correctional Center
 a. Applicant must be assigned to Minimum Building before he can apply.
 b. Application is made to the Minimum Classification team first, then to the Institutional Classification Team.
 
 
 [2]
 Sussex Correctional Institution
 Classification Committee makes final decision.
 
 
 [3]
 Women's Correctional Institution
 No variation from basic.
 IV. Specific Criteria for Admission to Plummer Center :
 
 
 [1]
 Six months to parole eligibility or release
 
 
 [2]
 Sufficient experience in the work/education release program at the institution to have demonstrated a stable, dependable work and adjustment record
 
 
 [3]
 Family or personal history associated with Wilmington area
 
 
 [4]
 A score of at least 34 points on the scoring tool used by Plummer Center
 
 
 [5]
 Approval by the Director, the Superintendent of the institution, and the State Work Release Supervisor in the case of any inmate with a sex crime or crime of violence
 NOTE: Exceptions can be made to all of the above procedures. Exceptions must be approved by the Superintendent and Supervisor for Work/Education Release. If there is a conflict between these two, it is to be resolved by a committee of the Superintendent, State Supervisor for Work/Education Release, and Assistant Director for Community Services.
 
 
 [4]
 Defendants' motion for a directed verdict as to F. Earl McGinnes and Donald R. Davis was granted at the close of the plaintiff's case. 443 F.Supp. at 1369 n. 1. Winsett has not appealed that disposition
 
 
 [5]
 See 443 F.Supp. at 1370. The "transfer" referred to by Horton was a project, ultimately unsuccessful, that Keve had been developing for several months. Essentially, Keve had hoped to work out a contract with the Corrections Department of the State of Minnesota under which the interstate transfer of certain inmates could be accomplished. It was felt that this project would be especially suitable for Winsett
 
 
 [6]
 There is no record of any motion by Winsett to join these defendants, and the testimony at trial indicates that they participated only in their official capacities. We will assume that these defendants were joined as subsequent prison officials as to whom injunctive or declaratory relief, barring similar decisions in the future, might be applicable. Because of our disposition of Winsett's plea for equitable relief, however, see infra at 1002-1003 and note 11, our consideration of these defendants as formal parties has no effect on their or anyone else's liability
 
 
 [7]
 With respect to tensions in the summer of 1976 between the Department and legislative leadership, Keve testified:
 Q. No. I am saying that were you to take steps which would have been positive with respect to Tom Winsett's work release, that it would have endangered or at least made more difficult your relationships with the powers in the General Assembly?
 A. Yes, it would have. We were already having various kinds of problems with the Legislature being very critical of the Department's operation, I would say from, oh, very early spring in 1976 right on through the summer. There were efforts in the Senate while it was still in session up to the end of June to make demands upon the Governor for my discharge, for instance, and frequent calls for changes; and, as I said, at the same time there were bills being pushed through the Legislature to circumscribe our privilege of extending outside status to inmates.
 
 
 [8]
 Later in the examination of Commissioner Keve, the court attempted to elicit from the witness precisely how great a factor in his consideration of Winsett's second application was the Legislature's intervention. Keve commented:
 There is another factor, and in one sense you can say it is a different factor and in another it is inseparable. . . . This one I mentioned, the fact that if Mr. Winsett had been put into work release, my assessment of his chances of parole, assuming he is still in Delaware, were such that I would have to assume that he would be in a work release much longer than what we would consider an optimum safe period of time for a person to be in work release, and that certainly was a factor that would reasonably give us much pause. But you see, it is still related to the same basic background condition because you ask, why was he probably not going to get parole very soon, and it goes right back to the same things, the public and legislative attitudes which the Parole Board also realistically had to give much weight to.
 
 
 [9]
 Indeed, Winsett indicated to the examining psychiatrist that he planned to return to Alabama once he was paroled because his parents and siblings are located there
 
 
 [10]
 See Note, The Mootness Doctrine in the Supreme Court, 88 Harv.L.Rev. 373, 374-77 (1974)
 
 
 [11]
 Because Winsett's suit for injunctive relief must be vacated, there can be no liability assessed against defendants Horton, Vaughn and Redman. See note 6 supra
 To the extent that Winsett's claim for declaratory relief is also addressed to the future application of impermissible criteria, the disposition of that claim will also be vacated with similar instructions. Insofar as the declaratory prayer is simply a predicate to a damage award, it survives this dismissal. Cf. Wolff v. McDonnell, 418 U.S. 539, 554-55, 94 S.Ct. 2963, 2968-69, 41 L.Ed.2d 935 (1974) (declaratory judgment as a predicate to a damage award survives dismissal of injunctive claim where latter is held to be available only through a separate habeas corpus proceeding).
 
 
 [12]
 See Note, supra note 10, 88 Harv.L.Rev. at 373
 
 
 [13]
 The Court has been willing to find a liberty interest once a prisoner has regained his freedom even though that freedom is subject to revocation and circumscribed by conditions of parole. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (liberty interest in parole revocation)
 
 
 [14]
 The dissent would allow public opinion to enter into the administrative decisionmaking process as a permissible and even significant element in granting or denying work release by prison officials. Dissenting opinion typescript at pp. 1014-1015. Under the dissent's thesis, prison officials could legitimately consider in the exercise of their discretion what they perceive may be public reaction, regardless of its lack of bearing on the prisoner's qualifications for participation in work release under the established state standards. Such form of decisionmaking could be dangerous to and destructive of procedural due process. Public opinion against a prisoner could be orchestrated on notes and chords as discordant as race, creed, ethnic background, labor activities, political views, or other factors having no pertinence to a prisoner's rehabilitative progress and fitness to participate in a work release program
 We do not deny that society has a legitimate interest in insuring the punishment of crime, especially serious felonies. But society also recognizes that more often than not there is a terminal point to retribution and that it should, as Delaware has done, concern itself with the rehabilitation and return of the prisoner to a productive role in the community. When a state undertakes to provide a work release program for the rehabilitation of its prisoners, some degree of imprecision in determining the eligibility of the candidates may be tolerated. But when discrepant treatment between prisoners is purposeful and participation in work release is denied to one prisoner only because of the Superintendent's amorphous perception of public opinion, then the laudable purposes of a structured program are skewed by a basic lack of fairness. If work release for a prisoner is not determined solely on the basis of the statutory and regulatory criteria established by the state but may also depend upon what may be perceived public reaction to it, these extraneous considerations can cut both ways. Not only can worthy work release applications be thereby denied but similar influences may compel admittance to the program of undesirable and unqualified applicants.
 
 
 [1]
 Winsett was not the only person who was denied work release after public outcry. Norman Parson, who had been convicted of the attempted rape and brutal murder of a young girl, also alleged that because of intense public resentment he had been denied furloughs and work release. See Parson v. Keve, 413 F.Supp. 111 (D. Del.1976)
 
 
 [2]
 The statute was amended in 1976 to substitute the word "shall" for the word "may." 60 Del. Laws c.705, § 1 (1976), amending Del. Code Ann. tit. 11, § 6533. Even if this amendment antedated Winsett's initial application for work release, however, my view of this case would remain unchanged. Under either version of the statute, the regulations actually adopted would have to be taken into account because the enabling statute does not delineate eligibility requirements
 
 
 [3]
 In meeting the plaintiff's equal protection claim, the district court observed that there was no proof of class-based discrimination but only an assertion of an individual misapplication of state law. The court, relying on Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), found the claim to be without merit. Winsett v. McGinnes, supra at 1373-74. Under the circumstances I do not find this conclusion to be erroneous and, in view of the majority's approach, see no need for elaboration
 
 
 [4]
 In late 1976, the Delaware legislature created the Institutional Release Classification Board to pass on all releases and consisting of seven members, three of whom were to be private citizens appointed by the Council on Administration of Justice. Del. Code Ann. tit. 11, § 6529A (Michie 1979). According to testimony, the three private citizens were to reflect public sentiment
 
 
 [5]
 In his letter to the state senator, Superintendent Anderson referred to the concern of Mrs. Paris, the widow of the state police officer whom Winsett shot and killed