### UNITED STATES ex rel. Roberto FLORES

v.

### Julius T. CUYLER et al.

### Civ. A. No. 77–318.

United States District Court, E. D. Pennsylvania.

March 24, 1981.

Andre L. Dennis, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Roberto Flores.

Carl Vaccaro, Pennsylvania Dept. of Justice, Philadelphia, Pa., for all defendants.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

Plaintiff Roberto Flores commenced this prisoner's civil rights action under 42 U.S.C. § 1983, claiming he was suspended from the Graterford Home Furlough Program without due process of law. The amended complaint seeks declaratory, monetary and injunctive relief.[1] Defendants named in the amended complaint are: Graterford Prison Superintendent Julius T. Cuyler; Deputy

---

1. Because plaintiff is no longer an inmate at Graterford, he has redefined his request for injunctive relief to require enjoining defendants from certain acts prospectively and directing them to remove any reference to this misconduct from his file.

Superintendent for Treatment and Operations Daniel Sims; Director of Treatment Lawrence Reid; and Inmate Counselors Frank Gillis and A. W. Taylor. A Lieutenant Hoagey was also named as a defendant, but all claims against him were dismissed for insufficient service of process. Now before the Court are cross-motions for summary judgment filed by all remaining parties on the issue of liability. For the reasons that follow, I will deny plaintiff's motion in all respects and will grant the motions of defendants Cuyler, Reid, Sims and Gillis. There remains a material factual issue to be resolved concerning the good faith defense of defendant Taylor; therefore, I will deny his motion for summary judgment.

## I. FACTUAL BACKGROUND

The relevant facts are as follows. Plaintiff was an inmate at Graterford from 1975 until March 7, 1979 when he was released on parole. This action was filed on January 27, 1977. In December, 1976, plaintiff was a participant in the Graterford Home Furlough Program and received a special Christmas furlough. The rules and regulations of the program require inmates to return on time or face possible sanctions in the form of suspension or revocation of pre-release status. Plaintiff's furlough authorization stated he was furloughed from 10:00 a. m. December 23, 1976 to 10:00 a. m. December 27, 1976.

Plaintiff left Graterford on December 23 and returned on December 27 at 2:20 p. m. Because plaintiff was four hours and twenty minutes late, defendant Gillis filed a misconduct report charging plaintiff with furlough lateness. A copy of this report was never given to plaintiff.

On December 29, 1976, defendant Taylor went to plaintiff's cell to discuss the incident. At the time, defendant Taylor knew he would be a member of the panel which would conduct a hearing on plaintiff's alleged misconduct. He asked plaintiff to explain his lateness which Mr. Flores did.

Plaintiff recounted how he planned to return to Graterford with Romon Conales,

an inmate in the work release program. When plaintiff arrived at Mr. Conales' house on December 27, he was informed that Mr. Conales' car was inoperable. Plaintiff then found a Mrs. Haggerty to drive him back to the prison. Allegedly, when Mrs. Haggerty arrived at Mr. Conales' house, Mr. Conales called Graterford and told defendant Reid that he and plaintiff would be late in returning to the prison; Reid allegedly assured the inmates that their late return was acceptable. Mrs. Haggerty became lost en route to Graterford, and plaintiff eventually arrived at the prison four hours and twenty minutes late.

After the interview, defendant Taylor decided to suspend plaintiff's pre-release status for nine months as punishment for the furlough lateness. He subsequently typed a report containing plaintiff's version of the incident, the panel's observations, the decision and the sanction. It is undisputed that the report was typed prior to the hearing.

Later on December 29, a hearing was held by defendants Taylor and Hoagey. Plaintiff was asked why he was late and he repeated the explanation given to defendant Taylor in his cell. Plaintiff did not have an opportunity to call any witnesses on his behalf, such as defendant Reid, Mr. Romon Conales or Mrs. Haggerty. Nor did plaintiff receive advance written notice of the hearing. At the hearing, no member of the panel recorded plaintiff's version of the incident. Plaintiff was told by defendant Taylor that defendants Taylor, Reid and Gillis had investigated the matter and reached a decision. Plaintiff asked if he were going to get a hearing and was advised that the decision had been reached.

The report previously typed by defendant Taylor was signed by defendants Taylor and Hoagey and plaintiff was then asked to sign it. Plaintiff initially refused; however, upon further request, plaintiff signed the form fearing that he would receive another misconduct if he continued to refuse.

After the panel's suspension of his pre-release status, plaintiff attempted to appeal the decision to Deputy Superintendent

Sims. However, no appeal was granted since plaintiff was charged with a minor misconduct which, under the prison rules, is not subject to appeal.

On May 19, 1977, defendant Sims interviewed defendant Taylor regarding his actions at the December 29 hearing. Subsequently, defendant Sims recommended a reprimand of defendant Taylor and reinstatement of plaintiff to furlough status. Apparently, these recommendations eventually were accepted by defendant Cuyler, as plaintiff was reinstated to the program with the ultimate effect that his suspension lasted for six months rather than the nine months originally ordered.

Plaintiff now argues that he is entitled to summary judgment on both the § 1983 claim and on an implied cause of action under Administrative Directive 801. Defendants argue that summary judgment should be granted in their favor because plaintiff has no liberty interest which was deprived and because he admitted the violation and thus was entitled to no hearing. Defendants further argue that they acted in good faith and therefore are entitled to immunity even if a constitutional violation occurred. In an attempt to dispose of the action on a nonconstitutional ground, I will address plaintiff's state law claim first.

## II. ADMINISTRATIVE DIRECTIVE 801

▇ While it is preferable to dispose of an action on a nonconstitutional ground, if possible, cf. *Hagans v. Lavine*, 415 U.S. 528, 549, 94 S.Ct. 1372, 1383–85, 39 L.Ed.2d 577 (1974); *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), I believe that plaintiff's state law claim is not properly before this Court. Though the amended complaint alluded to violations of Administrative Directive 801, it neither alleged nor implied that those violations might afford plaintiff a right to relief under Pennsylvania state law. The latter theory first surfaced in plaintiff's motion for summary judgment. At this late date, allowing the plaintiff to proceed on a new legal theory would prejudice the defendants as they have been operating on

the premise that the only issue raised by this action is a violation of due process. Because the alleged violation of Administrative Directive 801 has not been properly pled, I will not decide this issue. Accordingly, I turn to the heart of this case, plaintiff's due process claim.

## III. PLAINTIFF'S LIBERTY INTEREST

▇ The first step in a due process inquiry is to determine the nature of the private interest at stake, for only if government action deprives an individual of a cognizable "liberty" or "property" interest will the constitutional protection apply. *See, e. g., Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Claiming that he did possess a cognizable liberty interest, plaintiff analogizes the suspension of his pre-release status to loss of good time credits, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); revocation of probation, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); and revocation of parole, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Defendants contend, on the other hand, that the liberty interest asserted by plaintiff was illusory, because even with pre-release status, obtaining a furlough was conditioned on a favorable exercise of the prison authorities' discretion. Defendants liken plaintiff's claim to an application for discretionary parole release, *Greenholtz, supra*, or a request not to be transferred to another penal institution, *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), situations in which the Supreme Court has found no liberty interest.

In defendants' view, the presence of discretion vested in the prison authorities is fatal to plaintiff's claim. Under the applicable regulation, pre-release status is necessary, but not sufficient, to obtain a home furlough:

> (a) Home furlough shall be an earned privilege granted selectively to inmates placed on pre-release status with the institution prior to release.... 37 Pa.Code § 93–76.

Rather, an inmate who possesses pre-release status is entitled to apply for a furlough, and the decision to deny or grant the particular request rests within the discretion of the prison authorities. Because pre-release status, by itself, does not give an inmate freedom from confinement, defendants argue that it is not a cognizable liberty interest.

It is clear that defendants place too much emphasis on the element of discretion. In the first place, plaintiff is not challenging the prison's exercise of discretion. Cf. Greenholtz and Meachum, supra. His claim is that by suspending his pre-release status, he was deprived of the opportunity to go through the discretionary process.

Also, in Winsett v. McGinnes, 617 F.2d 996 (3d Cir. 1980), the Third Circuit held that a discretionary program may create a protectible liberty interest. The Winsett case concerned the Delaware work release program for state prisoners, a program quite similar to the pre-release furlough program at issue here. Reversing the decision of the district court, the Court of Appeals found that since regulations promulgated by Delaware established eligibility requirements, such regulations gave rise to a protectible interest in work release in those inmates who met the requirements. The Third Circuit observed:

> In Delaware, there are specific criteria for work release which we believe if met, give rise to a liberty interest in work release. Although discretion is vested in the prison authorities to grant or deny work release, that discretion must be exercised consistently with the purpose and policy behind work release. We hold that a state-created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulations and the exercise of the prison authorities' discretion is consistent with work release policy. We conclude that Winsett had a protectible liberty interest in work release because he met all eligibility criteria under the Delaware regulations and the considerations influencing the discretionary denial of work release, namely concern for public reaction and

fear of legislative reprisals, were outside the legitimate bounds of the prison officials' discretionary power.

Id. at 1007.

I believe that the facts of the instant case more strongly favor a finding of a protectible liberty interest than do the facts of Winsett, supra. Plaintiff Flores is not claiming that he was entitled to due process when he applied for pre-release status but rather that he was entitled to due process when he was suspended from that status. As Judge Henry Friendly has observed: "There is a human difference between losing what one has and not getting what one wants." Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1296 (1974). Here, plaintiff lost something when he was suspended from pre-release status: eligibility to be considered for home furloughs. That eligibility represented some quantum of liberty, and though the quantum may have been small, it was entitled to due process protection.

## IV. HOW MUCH PROCESS IS DUE

Having determined that plaintiff's pre-release status amounted to a liberty interest protected by the due process clause, I turn to the question of how much process is due in this situation. As the Supreme Court observed in Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), "due process is flexible and calls for such procedural protections as the particular situation demands."

This case presents issues of procedural due process, notice and the opportunity to be heard. As to the issue of notice, I do not believe that defendants' actions greatly prejudiced Mr. Flores. While plaintiff did not receive prior written notice of the charges against him as he should have, he did receive oral notification. Also, before taking the furlough, he was advised that a late return could result in the revocation or suspension of his pre-release status.

Plaintiff's right to an opportunity to be heard was violated. The record shows that Mr. Flores did not receive any meaningful

hearing before the suspension of his pre-release status. Knowing that he would be sitting on the panel which would hear plaintiff's case, defendant Taylor went to plaintiff's cell to discuss his late return from furlough. After this interview, Mr. Taylor decided the sanction that would be imposed, a nine month suspension of Mr. Flores' pre-release status. Prior to the hearing, defendant Taylor typed the report, including plaintiff's version of the incident, the panel's observations, the decision and the sanction. Given that the punishment had been determined beforehand and that plaintiff was not allowed to call witnesses, the hearing he eventually did have was meaningless.[2]

█ In a situation such as this, principles of procedural due process require, at the very least, that a prisoner facing loss of pre-release status be heard by a panel which has not prejudged his case and "sentenced" him before the hearing. In addition, the prisoner should be given the opportunity to present his case, including the opportunity to confront witnesses against him as well as to present witnesses on his own behalf.

Although I will not grant summary judgment in favor of defendants on the ground that plaintiff was not entitled to due process when he was suspended from pre-release status, I do find that with the exception of Mr. Taylor all defendants are entitled to summary judgment on other grounds.

## V. NO COGNIZABLE CLAIM IS PRESENTED AGAINST DEFENDANTS CUYLER, REID, SIMS AND GILLIS

█ I find that defendants Cuyler, Reid, Sims and Gillis are not liable under Section 1983 because the complaint does not charge nor has plaintiff come forward with evidence that these defendants actually participated in the deprivation of plaintiff's rights. Defendant Julius Cuyler was at all relevant times the Superintendent of Graterford Prison. In effect, plaintiff attempts to hold defendant Cuyler liable under a theory of respondeat superior. The allegations against him are that he was responsible for the general operation of the prison and therefore was liable to plaintiff for the improper actions of the prison staff. However, the doctrine of respondeat superior is usually not applicable in § 1983 actions. *See, e. g., DeTore v. Local # 245,* 615 F.2d 980, 983 (3d Cir. 1980). In *Howell v. Cataldi,* 464 F.2d 272, 279 (3d Cir. 1972), the Court of Appeals held that although proof of specific intent is not required, "there must be at least proof of the condition usually required by law for liability in a tort, for example, wrongful intent or culpable negligence." *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir. 1976), requires that defendants who are supervisory personnel must have knowledge of the wrong or acquiesce or participate in it to be held liable. Since defendant Cuyler is not charged with actual knowledge of or acquiescence in the deprivation of plaintiff's due process rights, there is no cognizable claim against him.

At all times pertinent to this matter, defendant Larry Reid was Director of Treatment at Graterford. According to the complaint and the evidence adduced, the part played by Mr. Reid in the deprivation of plaintiff's due process rights was an indirect and limited one. First, plaintiff contends that it was defendant Reid who received Mr. Conales' telephone call, inform-

2. Defendants contend that by admitting the violation, plaintiff was entitled to no further protection. They analogize his position to that of a criminal defendant pleading guilty and then requesting a trial. I find plaintiff's situation more analogous to that of a parolee facing parole revocation because he has enjoyed a liberty interest which he is now faced with losing. *Morrissey v. Brewer, supra,* establishes two basic inquiries for parole revocation hearings: first, did the parolee in fact violate the conditions of his parole, and if so, what action, if any, should be taken? In the instant case, the factual inquiry has been resolved because plaintiff admitted violating the furlough regulation. It is not clear, however, that the panel "hearing" plaintiff's case gave any consideration to the question of what sanction, if any, would be appropriate.

ing the prison officials that Mr. Flores would be late returning because of car trouble. Also, the complaint states that defendant Taylor told plaintiff that Larry Reid, along with defendants Taylor and Gillis, participated in the "investigation" of plaintiff's late return to the prison. There is nothing in the record to substantiate this last allegation. As to the first allegation, even if I were to accept plaintiff's representation that during the phone conversation defendant Reid told Mr. Conales that everything would be alright, such conduct does not amount to participation in the deprivation of plaintiff's due process rights. As the record does not disclose a constitutional violation by Mr. Reid, I will enter summary judgment in his favor.

Defendant Daniel Sims at all relevant times was the Deputy Superintendent of Graterford. The only allegation against Mr. Sims is that he was chairman of the prison's Program Review Committee to which plaintiff unsuccessfully attempted to appeal the suspension of his pre-release status. The record shows, however, that defendant Sims did investigate plaintiff's charge that he had not received a fair hearing. In a memorandum to Superintendent Cuyler, Mr. Sims recommended that plaintiff be restored to pre-release status and that defendant Taylor be reprimanded for failure to follow the correct procedures. (Exhibit J to plaintiff's memorandum). As there is no evidence of record to support liability on the part of defendant Sims for a violation of plaintiff's rights, I will grant summary judgment in his favor.

Summary judgment also must be entered in favor of defendant Frank Gillis, an inmate counselor at Graterford. The record shows that Mr. Gillis' only part in the process which resulted in a violation of plaintiff's constitutional rights was his preparation of a misconduct report at the time when plaintiff returned late to the prison from his furlough. While it is true that defendant Gillis failed to give plaintiff a copy of the report, this omission did not materially prejudice the plaintiff.

3. Generally, determinations of good faith should not be made on summary judgment.

All defendants have argued that should I find a violation of Mr. Flores' constitutional rights, they nonetheless are entitled to summary judgment on the basis of their good faith defense. Having found for all of the defendants except Mr. Taylor on other grounds, I turn now to consideration of his good faith argument.

In *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court held that a prison official will be immune from a § 1983 damages claim if he proves a good faith defense as stated in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). This standard involves both an objective and a subjective test of good faith:

> . . . a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are "charged with predicting the future course of constitutional law." A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Id.* at 322, 95 S.Ct. at 1001. (citation omitted)

As the record now stands, I cannot find as a matter of law that defendant Taylor either knew or should have known that he was violating plaintiff's constitutional rights or that he acted "with the malicious intention to cause a deprivation of [plaintiff's] constitutional rights or other injury."[3] *Wood, supra*, 420 U.S. at 322, 95 S.Ct. at 1001. Accordingly, the cross-mo-

tions for summary judgment as to defendant Taylor will be denied.