**C.P.M., Plaintiff,**

v.

**Victor D'ILIO, Individually and In His Official Capacity as Executive Director of the Bureau of Parole, et al., Defendants.**

**Civil Action No. 95–5832.**

United States District Court,
D. New Jersey.

Feb. 21, 1996.

C.P.M., Plaintiff, Pro Se.

Deborah T. Poritz, Attorney General by Howard J. McCoach, Deputy Attorney General, Trenton, NJ, for Defendants.

RODRIGUEZ, District Judge.

This matter is before the court on plaintiff's motion for preliminary injunction. Plaintiff, a parolee, seeks relief from a decision by the State of New Jersey's Bureau of Parole determining that it must notify plaintiff's employer of his parole status and the nature of his conviction. The court held oral argument on the motion on November 15 and December 15, 1995. During the December 15 argument, the court requested additional briefing by the State and reserved its deci-

sion. Having received and considered the supplemental briefs, the court grants plaintiff's request for injunctive relief for the reasons expressed below.

## I. *BACKGROUND*

In 1981, a jury found plaintiff guilty of kidnaping, in violation of N.J.Stat. § 2C:13–1(b)(2), criminal restraint, in violation of N.J.Stat.Ann. § 2C:13–2(a), aggravated assault, in violation of N.J.Stat.Ann. § 2C:12–1(b)(1), and possession of a weapon for an unlawful purpose, in violation of N.J.Stat. Ann. § 2C:39–4. At the time of the conviction, plaintiff was age 22 and had an extensive history of arrests as both an adult and a juvenile for assault and battery, breaking and entering, possession of drugs, probation violations, and other similar violations of the law. At the time of his sentencing, the probation officer's report stated that plaintiff's prior record and prior unsuccessful probationary periods, combined with the seriousness of the new offense, made it unlikely that the defendant would "successfully complete any probationary supervision." (Probation report).

The 1981 probation report summarized the current offense as an "altercation" which began on "Saturday evening at approximately 11:30 P.M., [when] the defendant, [C.P.M.], was attacked by several individuals in the rear parking lot at [a New Jersey hospital] while he was waiting for his wife. Four white males broke the windows in [C.P.M.'s] car, tore off the windshield wipers, and placed dents in the vehicle. [C.P.M.] was then struck in the arm and shoulder with a tire-iron. As a result of the beating that [C.P.M.] took, he approached the victim, [M.P.], in the parking lot [of a shopping mall three days later]. [C.P.M.] was accompanied by co-defendant [L.S.]. [L.S.] then threatened the victim, [M.P.], that he would be beaten up or stabbed if he did not get into the car belonging to [C.P.M.]." This, apparently, was the kidnaping. Sometime shortly thereafter, the "victim" climbed out of the car window and began running down the street. L.S. ran after M.P. and stabbed him in the back. L.S. and C.P.M. then drove away, leaving M.P. M.P. survived the stab-

bing. There is evidence that the altercation involved the sale of marijuana.

With his parents, C.P.M. voluntarily came to police headquarters and surrendered. At no point did M.P. contend that C.P.M. stabbed him. Plaintiff was sentenced to forty years with a ten year minimum on the kidnaping count. The sentences on the other counts either merged with count I or were served concurrently.

According to the probation report, C.P.M. admitted to "a history of drug abuse which include[d] the use of marijuana, hashish, heroin, stimulants, and depressants." In 1981, C.P.M. claimed to be using only marijuana and hashish, having undergone drug treatment from 1977 to 1979.

Plaintiff was paroled in 1991 after serving ten years of his sentence. A 1990 pre-parole/community release evaluation found him to be a "fair" parole risk. The report stated that C.P.M.'s "prison adjustment was initially poor," noting disciplinary charges. However, the report found that, by 1990, C.P.M. was not a risk for suicide, assault, or escape. The report recommended intensive supervision, urinalysis, counseling, and voc/ed aid.

Plaintiff argues in his affidavit and verification of complaint that the "Assistant Prosecutor who prosecuted plaintiff urged the Parol Board to grant plaintiff parole based on substantial evidence of rehabilitation." The Parole Board's 1991 certificate of parole for C.P.M. provides a list of conditions of parole, including that C.P.M. participate in "random urine monitoring ... until discharge is approved" and "participat[e] in a Narcotics Anonymous Program." No condition required him to notify an employer of the conviction or his status as a parolee.

Plaintiff began working for a mental health services organization in early 1992. Plaintiff states that the parole board has known of his employment at the facility "since 1992." The State asserts that "it is unclear when C.P.M. notified his parole officer of his current employment, [but that] Bureau of Parole officials were aware of [C.P.M.'s] current employment by February 28, 1994.

Plaintiff also argues that his "parole supervision has continuously reduced over the

years, [and that] for the past two years plaintiff only has to report once a year to parole." Plaintiff also notes that he received a Bachelor of Science Degree in Business Administration in 1995 and is presently preparing for graduate school.

On November 14, 1995, the Bureau of Parole notified C.P.M. that contact would be made with his current employer advising the employer of CPM's parole status and his convictions. C.P.M., *pro se,* immediately filed a complaint seeking a T.R.O. and/or preliminary injunction. Plaintiff's complaint seeks both injunctive relief and damages, and asserts constitutional claims under the Fourteenth Amendment and the Eighth Amendment.

During oral argument, the State conceded that it has no suspicion or evidence that C.P.M. has in any way violated the conditions of his parole. Instead, the State indicated that recent incidents by other parolees had inspired them to examine all parolees' files. In doing so, they discovered that plaintiff's employer had never been contacted, and determined that they needed to comply with their internal standards by notifying the employer of C.P.M.'s parolee status. The State agreed to refrain from contacting C.P.M.'s employer until such time as the parties had briefed the issues and the court determined plaintiff's motion for injunctive relief.

## II. *STANDARD*

■ The party seeking injunctive relief must demonstrate: 1) the likelihood of ultimate success on the merits; 2) probability of irreparable harm in the absence of injunctive relief; 3) balance of hardships in favor of granting the requested relief; and 4) public interest in favor of granting the requested relief. *Alessi v. Pennsylvania,* 893 F.2d 1444, 1447 (3d Cir.1990).

## III. *DISCUSSION*

### A. *Statutes and Internal Parole Standards*

New Jersey law provides that "[e]ach parolee shall at all times remain in the legal custody of the Commissioner of Corrections, ... [and] shall remain under the supervision of the Bureau of Parole of the Department of Corrections in accordance with the rules of the board." N.J.Stat.Ann. § 30:4–123.59.a. Subsection b further provides that each parolee must "abide by specific conditions of parole established by the appropriate board panel which shall be enumerated in writing in a certificate of parole and shall be given to the parolee upon release." N.J.Stat.Ann. § 30:4–123.59.b. Notably, subsection e provides that the "assigned parole officer shall provide assistance to the parolee in obtaining employment, education or vocational training ..." N.J.Stat.Ann. § 30:4–123.59.e. Although, as noted, no condition on plaintiff's certificate of parole required that the plaintiff notify his employer of his parolee status, the State asserts that "[s]uch notification is required pursuant to section 802.5 of the Bureau of Parole's Standards." This notification provision apparently dates back to 1973, when it was contained in a "Procedural Memorandum # 8" dated June 28, 1973. The 1973 provision states, in part:

3. *Verification of employment*—certification of employment by a responsible person at the place of employment or through a reliable and authentic instrument or form used in an employee-employer relationship. When doubt exists as to the validity of the form used for verification, an employment visit is required....

*In the following instances, employers will be notified, preferably by the parolee, as soon as possible, but no later than thirty days from the start of employment where:*

(a) Parolee is employed on a "live-in" job, meaning employment and residence on the property of the employer,

(b) criminal history includes aggressive crimes against person such as murder, assault and arson, indicating a potential threat to the employers or other employees,

© criminal history indicates a conflict with the type of employment, such as the forger employed in a bank, or a narcotic offender in a hospital, and

    .    .    .    .    .

The District Supervisor is responsible for controls to verify the parolee's claim of

notification, and to arrange for the parole officer to complete the notification if the parolee fails to notify.

[Procedural Memorandum # 8, p. 3, attached to State's brief, emphasis added.] The State's brief contains a slightly different version of the notification rule in the offered Section 802.5 of the Bureau of Parole's Standards. The only pertinent change in the wording of the provision is that the Section 802.5 version requires that the employer "shall be notified within 30 days from the outset of employment, preferably by the parolee that he or she is on parole, the reason therefore, [and] prior criminal history...." The State has not provided a date of implementation of this newer provision, Section 802.5, although such information was requested by the court.

In an affidavit, Mario Paparozzi, Assistant Chief of the Bureau of Parole, states that these internal rules are the only provisions requiring employer contact and that "such employment contacts are simply an inherent part of the parole supervision process." Paparozzi further states that "employment contacts play a significant role in proper parole supervision, ... allow[ing] parole officers to scrutinize the employment site to determine whether any problems have developed which could have an adverse impact on the parolee's continued supervision in the community." The State asserts that their intent in notifying the employer is to "allow the parole officer, who is vested with the duty of supervising the parolee, to determine if the parolee is performing adequately in the community [and] to alert the parole officer to an environment that may not be conducive to the parolee's adjustment in the community." Further, the State notes that job site visits are an integral part of the parole supervision process.

The State also correctly notes that, since 1979, N.J.Stat.Ann. § 30:4–123.48(g) and N.J.Stat.Ann. § 30:4–123.45(b)(5) have required that the parole board give public notice prior to considering inmates for release and that, under N.J.Stat.Ann. § 52:4B–44(b)(21), victims must be notified of an inmate's release. Further, "New Jersey specifically guarantees public access to all court records, including criminal records." *Doe v. Poritz*, 142 N.J. 1, 80, 662 A.2d 367 (1995). Citing these statutes, the State contends that there is no constitutional restriction on its right to contact C.P.M.'s employer, because this information is readily available to the employer through public records.

### B. *Analysis*

#### 1. *Delay by the Board in Notifying C.P.M.'s Employer*

■ In determining whether the parole board's contact with C.P.M.'s employer is improper, the court first turns to the language of the board's own rules. *See Troia v. Wiggin*, 705 F.Supp. 1014, 1016 (S.D.N.Y. 1989) (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979)). The state admits that the Section 802.5 rule is the only provision requiring employer contact; there is no corresponding statute or regulation. Notably, both versions of the internal rule require employer notification within thirty days from the start of employment if the parolee falls within the noted classifications. The 1973 version states that the notification will occur "as soon as possible, but no later than thirty days from the start of employment...." The Section 802.5 version, with unknown date of origin, states that the employer "shall be notified within thirty days from outset of employment...." In each case, the timing is unambiguous, requiring mandatory contact within thirty days. This limitation on the parole board's discretion "strikes a proper balance between the rights of the parolee and the parole authorities. While parole is admittedly a legislative grace, the parolee has the right not to be subjected to arbitrary action." *Id.* at 1017.

Although we have been unable to locate any other court decision holding it improper for a parole board to contact an employer after an unreasonable delay, there are numerous analogous cases supporting such a finding in the context of parole revocation. These include *United States v. Hamilton*, 708 F.2d 1412 (9th Cir.1983) ("Revocation of probation [by district court] after unreasonable delay or under circumstances inherently misleading to the probationer is an abuse of

discretion."); *LaChance v. Reno*, 824 F.Supp. 29 (S.D.N.Y.1993), *aff'd*, 13 F.3d 586 (2d Cir.), *cert. denied*, ── U.S. ──, 114 S.Ct. 2711, 129 L.Ed.2d 837 (1994) (acknowledging *Hamilton, supra*, but holding that absent unfair tactics and prejudice to parolee, delay does not violate due process); *United States v. Tyler*, 605 F.2d 851 (5th Cir.1979) (delay of one year in seeking revocation for misdemeanor charges deprived probationer of right to due process); and *Greene v. Michigan Dept. of Corrections*, 315 F.2d 546 (6th Cir.1963) (reversing and remanding for hearing to determine from facts whether delay was reasonable where parole officials waited nine years before executing arrest warrant for parole violation). Notably, these cases involved violations of the parolees' or probationers' due process rights arising out of an established constitutional right to a hearing prior to revocation.

In *Hamilton supra*, the district court revoked the appellant's probation, part of which required that the appellant spend sixty weekends in jail. After completing 49 weekends, the appellant failed to report to jail. The record was devoid of evidence that he was admonished and, in fact, suggested that the probation officer did not consider the failure serious. *Hamilton*, 708 F.2d at 1413–14. However, the appellant later took it upon himself to notify the court and sought to complete the jailtime. The court took no action. Notable to the Court of Appeals was the fact that the appellant "was apparently accorded substantial leeway by his probation officer. The record below indicates that the two men did not meet regularly." Further, "Hamilton reported his whereabouts and activities on an informal basis, and [ ] such a course of affairs was acceptable to the probation officer." *Id.* at 1414.

After being assigned a new probation officer, Hamilton failed to meet with the new officer and to appear before the court, as he was instructed. In a subsequent parole revocation hearing, appellant explained his absences and offered proof that he was gainfully employed despite the government's contention to the contrary. *Id.* The district court revoked his probation for failure to complete the weekend jail time, failure to

report to his probation officer and the court, and failure to work at a lawful occupation. *Id.*

Noting that the district court had "broad discretion to revoke probation if its conditions [were] violated," *id.* at 1414, the Court of Appeals stated that "[r]evocation of probation after unreasonable delay or under circumstances inherently misleading to the probationer is an abuse of discretion." *Id.* at 1415. Noting appellant's attempt to correct his failures, the Court of Appeals stated that "[a]t some point, . . ., violations of which the district court has been apprised . . . become stale or are waived as a basis for revoking probation." *Id.* (citations omitted). The Court of Appeals further noted, with regard to Hamilton's failure to appear and make timely reports of his employment, that the "officer was apparently satisfied with Hamilton's conduct, and during his more than four years of probation under the officer's tutelage there is nothing in the record to indicate that Hamilton engaged in any sort of antisocial or opprobrious conduct for which probation should be revoked." *Id.*

In the instant case, there is no evidence on the record that C.P.M. was ever instructed that he must inform a new employer of his parole status. This requirement was not contained in plaintiff's parole certificate, nor is there any suggestion that the internal rule was published and accessible to C.P.M. *See LaChance, supra*, 13 F.3d at 589 (no waiver by parole commission despite lapse of time and failure to notify parolee of street time forfeiture provision because "parolee is on constructive notice of the consequences of violation by . . . published regulation.").

Further, the State does not express any concern that C.P.M. might be a danger to his employer and other employees. Instead, the State concedes that it is correcting a situation caused by other parolees' misconduct and crime. This correction of probation records, however, seriously risks prejudicing C.P.M.'s employment.

No matter what language is used by the parole board in informing C.P.M.'s employer of his parolee status, the employer must reasonably infer that C.P.M. is possibly dangerous, otherwise notification after three years

of employment would seem unnecessary. In the event that C.P.M.'s employer is not willing to risk that possibility and terminates him, C.P.M. will be unable to obtain a good reference from a long-term employer. This will seriously prejudice his employment prospects.

Having determined that the parole board unreasonably waited over three years to comply with their own rule requiring notification to the employer within thirty days, and having determined that such an extreme delay is prejudicial to C.P.M.'s ability to remain employed, the court, however, cannot enjoin the parole board unless such notification would violate plaintiff's constitutional rights.

### 2. Due Process

In *Doe v. Poritz, supra,* the New Jersey Supreme Court considered a challenge to recent state legislation which requires a paroled sex offender to register with the State, and provides for community notification of the release if the offender falls within certain classifications. The court acknowledged that the purpose of the legislation was to protect the public in light of the recognized high rate of recidivism. In addition to finding that the statute did not violate the *ex post facto* clause, the court found that the notification provisions of the statute did not constitute double jeopardy, cruel and unusual punishment, violate plaintiff's right to equal protection of the law, or violate plaintiff's substantive due process rights.

However, the *Doe* court found that the plaintiff had an interest in privacy and reputation protected by procedural due process afforded under both the federal and state constitutions. Noting their holding that the plaintiff was not protected by a substantive due process right, the court stated that the question was whether the notification law required procedural protection to "assure fairness and accuracy in carrying [the notification provisions] out." *Doe,* 142 N.J. at 99–100, 662 A.2d 367.

The *Doe* court agreed with the plaintiff's assertions that the notification process branded him as a sex offender and as "potentially currently dangerous," thereby infringing protectible liberty interests and requiring a pre-notification hearing. *Id.* at 100, 662 A.2d 367. Also noting the expanded protection under the state constitution, the court stated that "[w]here a person's good name or reputation are at stake because of what the government is doing to that person, we conclude, sufficient constitutional interests are at stake." *Id.* at 104–5, 662 A.2d 367. Because of the potential harm to reputation which would arise with the community notification, the court found that sex offenders included in the two classifications requiring community notification (Tier Two requiring notification to schools, religious and youth organizations and Tier Three requiring notification to the general public) had the right to a hearing prior to notification under both the federal and state constitutions. *Id.* at 103–07, 662 A.2d 367.

Although the *Doe* court found constitutionally protected interests in the federal and state due process clauses, the *Doe* court also stated that "[e]ven if principles of due process did not require that defendants classified as Tier Two or Three be granted a pre-notification hearing, such process would be required by considerations of fundamental fairness." *Id.* at 107–08, 662 A.2d 367. The court explained:

> New Jersey's doctrine of fundamental fairness "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against government *procedures* that tend to operate arbitrarily. [It] serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action." *State v. Ramseur,* 106 N.J. 123, 377[,] 524 A.2d 188 (1987) (Handler, J. dissenting).... "Fundamental fairness is a doctrine to be sparingly applied. It is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." *State v. Yoskowitz,* 116 N.J. 679, 712, 563 A.2d 1 (1989) (Garibaldi, J. concurring and dissenting).

*Doe,* 142 N.J. at 108, 662 A.2d 367. The court specifically noted that the "concept" had been applied to "require procedures to protect the rights of defendants at various

stages of the criminal justice process even when such procedures were not constitutionally compelled." *Id.* The court also noted that the doctrine had been "invoked when the *actions of government, though not quite* rising to the level of a constitutional violation, nonetheless included aspects of fairness which required this Court's intervention." *Id.* The court explained that, "[a]lthough we have applied the doctrine of fundamental fairness in a variety of contexts, there is one common denominator in all of those cases: a determination that someone was being subjected to potentially unfair treatment and there was no explicit statutory or constitutional protection to be invoked." *Id.* at 109, 662 A.2d 367.

■ In determining whether C.P.M. has a right under the Due Process Clause to prevent the parole board from contacting his employer, the court must first determine whether the plaintiff has a protectible liberty interest in his employment. In making this determination, we note that Fourteenth Amendment protection has been frequently recognized where a state has created a liberty interest through the language of statutes, regulations, or by "official policies or practices" promulgated by a state agency. *Winsett v. McGinnes*, 617 F.2d 996, 1004–06 (1980) (Delaware department of corrections regulation created liberty interest in work release program), *cert. denied*, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981); *Baumann v. Arizona Dept. of Corrections*, 754 F.2d 841, 844 (9th Cir.1985).

In the instant case, the court notes that 1) New Jersey law provides that the "assigned parole officer *shall* provide assistance to the parolee in obtaining employment...." N.J.Stat.Ann. § 30:4–123.59e (emphasis added); 2) the internal procedure providing for employer notification mandates that such notification will occur within the first thirty days of employment; and 3) the parole board has refrained from carrying out the notification provision, apparently exercising discretion on an individual basis in deciding whether or not to notify an employer. The court finds that these factors, particularly the mandatory restraint on discretion imposed by the language in both the statute and internal

provision, support a finding of a protected liberty interest. *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). Other courts have also determined that parolees have a protected right in legitimate employment. *See Kaufhold v. Bright*, 835 F.Supp. 294 (W.D.Va.1993).

Having determined that C.P.M. has a liberty interest protected by the Due Process Clause, the next determination to be made is "how much process is due in this situation?" *United States ex rel. Flores v. Cuyler*, 511 F.Supp. 386, 390 (E.D.Pa.1981). The State contends that, if process is due, it has already been provided because plaintiff received prior notice from the parole board of the proposed notification, and his arguments have been heard and considered by this court.

However, it is the State's contention that it need not consider the facts of C.P.M.'s case individually, but instead must now comply with the notification requirement, regardless of whether the State considers plaintiff a danger to the employer. As such, it is not the notice and form of hearing which concerns the court, but instead the refusal by the parole board to exercise its discretion in reasonably evaluating C.P.M.'s achieved level of rehabilitation and the risks currently presented to the employer.

■ "Procedural due process seeks to ensure the accurate determination of decisional facts, and informed, unbiased exercises of official discretion." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 797, 100 S.Ct. 2467, 2481, 65 L.Ed.2d 506 (1980) (Blackmun, concurring). As in parole revocation proceedings, where "most States have recognized that there is no interest on the part of the State in revoking parole without any procedural guarantees at all," or as in the instant case, risking plaintiff's loss of employment, "[w]hat is needed is an informal hearing structured to assure that the finding [requiring notification] will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972).

In a case similar to the one before us, the Court of Appeals for the Third Circuit upheld plaintiff's procedural due process cause of action where Delaware prison officials had impermissibly permitted a "concern for public reaction and fear of legislative reprisals" to affect their discretionary decisions on admitting prisoners to a work release program. *Winsett,* 617 F.2d at 1007. There, Winsett had been convicted of the murder of a Delaware State Police Officer, and the department of corrections had received letters condemning the proposed admission of Winsett to a work release program. *Id.* at 999–1000. The Court of Appeals held that the impermissible influence of public opinion distorted the normal procedure for considering Winsett's application. In finding that Winsett had been deprived of his due process rights, the court stated that "[i]f the authorities do not properly exercise their discretion, the process due ... is denied." *Id.* at 1008. The court cautioned that prison officials must exercise their discretion "consistently with the purpose and policy behind work release." *Id.* at 1007.

As the State argues in its brief, "[t]he overriding goal of the parole system is to give the parolee a chance to further and to demonstrate his rehabilitation while serving a part of his sentence outside the prison walls." (State's brief, p. 12, quoting *Latta v. Fitzharris,* 521 F.2d 246 (9th Cir.), *cert. denied,* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975). Here, it is apparent that the parole board's refusal to exercise any discretion in determining whether to notify C.P.M.'s employer of his status denies his right to due process by failing to take into consideration his demonstrated rehabilitation. In fact, the board's rigid determination to disregard C.P.M.'s achievements risks a reversal of that rehabilitation.

Therefore, with regard to the standard for granting injunctive relief, the court finds that 1) plaintiff has demonstrated a likelihood of success, in that the parole board has violated plaintiff's right to due process, and 2) the prejudice to plaintiff's employment, current and future, demonstrates the probability of irreparable harm absent the injunctive relief.

As for the third prong of the test, *i.e.,* balancing of hardships in favor of granting the requested relief, the court further finds that the balance weighs in favor of the plaintiff. Plaintiff is undoubtedly harmed by the intended notification. Nothing short of a prohibition on contact will remedy that harm. The parole board, on the other hand, is not seriously hampered by its inability to contact plaintiff's employer in this instance. For example, at oral argument the State contended that the plaintiff has a past history of drug abuse and that he is currently working in an environment which may provide him with access to prescription drugs. However, as noted, the State has no suspicion that C.P.M. is abusing drugs. Further, one of the noted conditions of C.P.M.'s parole, listed on his parole certificate, is submission to random urine testing. This condition of parole gives the board the tool it needs to evaluate whether C.P.M.'s employment is a danger to him or to his employer. As such, the injunctive relief imposes no significant hardship on the parole board in carrying out its statutory obligations.

With regard to the final prong of the test, public interest, there is no question that society has an interest in the rehabilitation and reassimilation of offenders into productive, employed, tax-paying citizens. *Morrissey,* 408 U.S. at 484, 92 S.Ct. at 2601. This interest compels a determination that rehabilitated offenders, such as C.P.M., not be negatively affected by arbitrary parole decisions.

■ On the facts of this case, where the State did not comply with its own procedures requiring employer contact within thirty days, where the State has no evidence or even a suspicion that the plaintiff is a risk to society, where the State has deemed the plaintiff sufficiently rehabilitated to require only a once-a-year evaluation by the parole board, where the plaintiff has obtained a college degree after release from prison and has been gainfully employed in a profession with a single employer for over three years, and where there is no evidence that the parolee attempted to hide his employment to prevent employer contact required by a published regulation, employer notification can

only risk adverse consequences to plaintiff's new and productive life. Society has an interest in preventing government from applying rules in an arbitrary manner to the detriment of its rehabilitated offenders.

To clarify, this order does not limit the parole board's authority to supervise the employment of parolees where, in accordance with internal procedures, the board informs an employer either before employment begins or within the time provided by the board's own requirements. Nor will the court interfere with an employment contact if the board deems it necessary within a reasonable amount of time after a parolee obtains new employment. The court merely hold that, under these facts, three years was clearly unreasonable and plaintiff has the right to protection from the parole board's apparent refusal to rationally apply its discretion in determining whether to notify plaintiff's employer of his status.

Further, the court recognizes that the parole board must have an unfettered right to inform an employer of the parolee's status where the parolee's actions imply potential recidivism. Because the State does not, and apparently cannot, contend that such is the case with C.P.M., the plaintiff's motion for injunctive relief will be granted.

An appropriate order will be entered.

### ORDER

For the reasons set forth in this court's Opinion, filed even date,

IT IS ORDERED on this 21st day of February, 1996, that plaintiff's motion for injunctive relief is *GRANTED*.